# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1101V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | \* | |
| ALICE HENNINGSEN, | \* | Chief Special Master Corcoran |
| | \* | |
| Petitioner, | \* | Filed:  May 8, 2026 |
| | \* | |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH AND | \* | |
| HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Anne C. Toale,* Mctlaw, P.A., Sarasota, FL, for Petitioner.

*Meghan Murphy,* U.S. Department of Justice, Washington, DC, for Respondent.

### ENTITLEMENT DECISION[1]

On March 23, 2021, Alice Henningsen filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1) ("Pet."). Petitioner alleges that she experienced transverse myelitis ("TM") due to an influenza ("flu") vaccine she received October 31, 2019. Pet. at 1.

The matter went to hearing on May 12–13, 2025, with the parties' dispute focused on the issue of diagnosis: TM versus a spinal cord infarct. Now, based on review of the record and filed briefs, I deny entitlement in this tragic case. It has not been preponderantly established that Petitioner likely experienced TM—and even if she had, it is also not likely the flu vaccine caused her injury.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

## I.    Factual Background

Petitioner was 26 years old when she received a flu vaccine on October 31, 2019. *See* Ex. 2 at 5. Significantly, there is no record evidence that Ms. Henningsen experienced any immediate vaccine reaction. And nothing in the record establishes that in the weeks prior to the emergency hospitalization described below, Petitioner was experiencing an autoimmune process likely leading to illness. Rather, the record is devoid of any concerning outward symptoms for well over a month.

On December 8, 2019 (thirty-nine days post-vaccination), Ms. Henningsen arrived at the emergency department ("ED") of Ascension Via St. Christi Francis in Wichita, Kansas, around 1:15 – 1:20 pm, complaining of tightness and pain in her back, numbness and tingling in her bilateral lower extremities, and altered sensation in her lower and upper extremities. Ex. 5 at 12, 19–20. She explained at the hospital that she had experienced pain in her right shoulder blade the previous day which seemed to have resolved on its own, but that the pain had returned, and had begun radiating up her neck to the base of her skull, as well as down her spine. *Id*. at 37.

Petitioner also informed emergency treaters that progression of her symptoms was notably rapid. In an intake medical record from December 8th (containing a time stamp of 2:32 pm), Petitioner reported the onset of the acute pain and sensations that lead her to seek emergency care as beginning two hours prior, or around 12:30 pm. Ex. 5 at 12. In addition, at the time of her arrival at the hospital, Petitioner was still able to walk, but not long after she could no longer lift her left leg, and had decreased ability to move her right leg. *Id*. Thus, a clear and downward progression of Petitioner's symptoms was occurring—within a two to three-hour timeframe, measured from the moment of onset.

That very day, treaters began their efforts to ascertain an explanation for Petitioner's sudden debilitating symptoms. An initial MRI of petitioner's cervical, thoracic, and lumbar spine was performed without contrast[3] around 3:00 pm that day. *See* Ex. 5 at 15–17. The results were all deemed unremarkable, however (beyond some evidence of preexisting degenerative changes). *Id*. In particular, this first set of MRI images did not appear to reveal the presence of any signal corroborating the existence of spinal cord lesions (although at this time Petitioner was plainly experiencing significant and alarming clinical symptoms—and as noted below, *both* radiologic

---

[3] "Enhancement" refers to "any method of exaggerating the visible difference between adjacent structures on imaging by administering contrast media/agents." *Curry v. Sec'y of Health & Hum. Servs.*, No. 22-729V, 2025 WL 1693655, at n.5 (Fed. Cl. Spec. Mstr. Apr. 28, 2025). Gadolinium is a contrast agent injected into an imaged patient's blood, and it causes images to appear brighter where damage to the central nervous system's "blood brain barrier" is sufficient to allow leakage into it (thus permitting the gadolinium agent to enter the central nervous system). *Osenbach v. Sec'y of Health & Hum. Servs.*, No. 16-419V, 2023 WL 5714809, at *17 n.32 (Fed. Cl. Spec. Mstr. Aug. 8, 2023), *aff'd*, No. 2024-1663, 2025 WL 2387944 (Fed. Cir. Aug. 18, 2025).

experts who testified in this matter agreed that the conclusions drawn from the first MRI by contemporaneous treaters were in error).

That afternoon, Petitioner continued to feel weaker. Ex. 5 at 18. Ms. Henningsen was subsequently admitted to the Intensive Care unit ("ICU") for further evaluation. *Id.* at 32. By this time (which the ICU record suggests was close to 5:30 pm—the same day her symptoms had begun a few hours earlier), she could no longer move her extremities. *Id.* at 37. On exam, Petitioner had a weak cough and was breathing deeply, but she stated that swallowing was becoming more difficult. *Id.* The admitting physician noted that Petitioner reported receiving a flu vaccine about three weeks prior, and removal of her birth control implant about a month prior. *Id.*

Petitioner's onset was again noted to have occurred around noon on December 8, 2019, based on her history recollections. Ex. 5 at 55. The ICU physician assessed Ms. Henningsen with acute flaccid quadriplegia, but was still considering whether the correct diagnosis was cervical myelopathy, myelitis, acute inflammatory demyelinating polyneuropathy, or spinal cord ischemia. *Id.* at 40. Labs taken the same day were unremarkable, though testing for antibodies to a West Nile virus was positive. *Id.* In addition, a lumbar puncture to assess cerebrospinal fluid ("CSF") occurred around 8:00 pm that evening, but it revealed normal protein, a normal white blood cell count of 1 (out of a range of 1-10), and no other evidence of spinal cord inflammation. *Id.* at 1401.

On the evening of December 8th, a second round of MRIs (this time of Petitioner's brain and cervical spine) were performed, with contrast plus diffuse weighted imaging ("DWI").[4] Ex. 5 at 1509–10. DWI was employed based on the treating neurologist's view that it could potentially "rule out" cervical cord ischemia—although the treater noted as well that an exam of Petitioner had not revealed sparing of her vibration sensation, which in his view made ischemia "less likely." Ex. 5 at 55. The brain MRI yielded normal results. *Id.* at 1510. The repeat cervical imaging established no abnormal enhancement (which would be evidence of active inflammation) or degenerative concerns. *Id.* The record of this cervical MRI does not mention findings pertinent to DWI.

Early the next morning (December 9, 2019), during a critical care consultation continued issues with Petitioner's breathing were observed. Ex. 5 at 2731, 2736. Treaters had trouble confirming Petitioner's reports of breathing issues with clinical evidence of a deficiency, however, and seemed to deem breathing concerns something to watch. *See, e.g., Id.* at 2735-36 ("[n]o acute

---

[4] DWI is an MRI technique that permits observation of the motion of water molecules within tissue, providing contrast based on cellular density and microstructure, and has special utility when attempting to diagnose stroke/infarct. Highly cellular tissue restricts water movement, appearing bright, while free-moving water appears dark. *Ross v. Sec'y of Health & Hum. Servs.*, No. 22-136V, 2025 WL 3531575, at n.4 (Fed. Cl. Spec. Mstr. Nov. 14, 2025).

cardiopulmonary process, - monitor closely with low threshold for NIPPC[5] *or intubation if needed*") (emphasis added), 2737 ("[r]esp: FVC was 300 today but clinically she doesn't appear to be that weak as that value is incredibly low. Will repeat and trend q8h. In the meantime, will change to HFNC to decrease her WOB as subjectively she says she's having issues but clinically I don't appreciate it"). But Petitioner was later intubated in the early morning of December 10th. *Id.* at 5203. She also now had a rash on her extremities, hands, chest and back, so antibiotic management was requested, and she was prescribed prednisone. *Id.* at 43–44.

On the afternoon of December 10, 2019, another MRI was performed (this time of Petitioner's brain) but it also yielded normal results, although a dedicated orbit MRI was recommended. Ex. 5 at 1506–07. A second cervical spine MRI occurred the same day (performed with and without contrast). *Id.* at 1507–08. Although this imaging again yielded no evidence of degenerative issues, "extensive T2 hyperintensity has developed throughout much of the cervical cord extending from the level of C2 to at least the level of T3," along with "mild scattered enhancement," and evidence of edema throughout the cord that had progressed since the imaging from December 8th. *Id.* at 1507, 1508. The radiologist who performed the MRI specifically noted that "[g]iven the long segment involvement, rapid progression and diffuse cross-sectional involvement, findings most likely represent transverse myelitis or a demyelinating process such as neuromyelitis optica." *Id.* at 1507.

Petitioner remained hospitalized throughout mid-December. She underwent yet another MRI on December 18, 2019, this time of her cervical and thoracic spine, and it was performed with and without contrast. Ex. 5 at 1086–87. The imaging showed further progression of T2 signal changes, into upper thoracic cord, extending from medulla to the level of T5-6, with the latter progression deemed "convincing evidence of a gray matter process." *Id.* at 1086. But there was also evidence of "abnormal diffusion-weighted imaging within the mid cervical cord," plus "new irregular patchy enhancement throughout the cervical cord." *Id.* Overall (and with some emphasis on the finding of gray matter thoracic involvement), the radiologist who performed the MRI deemed the results to be suggestive of a subacute cord infarct." *Id.* (A progress note prepared by one of Petitioner's treaters later that month characterized the results of this particular MRI to "favor ischemia rather than inflammatory process." Ex. 5 at 67).

A follow-up lumbar puncture to test Petitioner's CSF occurred on December 18, 2019. Ex. 5 at 1401. It again revealed normal protein levels, but a white blood cell count of eleven, one over the lab's range of normal (1-10). *Id.* (as discussed below, the parties dispute the medical validity of this range). Notably, this CSF sample was taken ten days after Petitioner's onset. The next day (December 19, 2019), a spinal angiogram was performed, and compared to the results of the

---

[5] "NIPPC" stands for "Noninvasive Positive Pressure Ventilation"—a medical treatment that delivers breathing support using a mask, rather than via an invasive breathing tube (endotracheal tube). *Noninvasive Ventilation*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK578188/ (last visited May 8, 2026).

December 18th cervical/thoracic MRIs. *Id.* at 1516–18. (The preamble section of the report clearly identifies Petitioner's differential at this time as "suspected transverse myelitis versus possible cord infarct"). *Id.* at 1516. The angiogram showed "patency of the anterior spinal artery," as well as segmental medullary arteries bilaterally, with normal appearing capillary and venous blush of the cervical cord. Ex. 5 at 1518. No other interpretation of the findings is contained in the imaging report.

On December 25, 2019, Petitioner began receiving IVIG therapy, which she completed four days later. Ex. 5 at 67. On the 26th, she was evaluated for transport to a rehabilitation facility for further care. *Id.* Petitioner continued to receive care in the ICU until January 7, 2020, when she was discharged and transferred to Craig Hospital for in-patient rehabilitation. *Id.*; Ex. 1 at 45.

*Treatment in First Half of 2020*

Petitioner remained at Craig Hospital from early January to late March 2020. Ex. 1 at 45. Upon admission, it was noted that she had been diagnosed with pneumonia while in the ICU and treated for it with an antibiotic. *Id*. Petitioner now reported blurry vision for the first time, and she continued to have shortness of breath, for which she was still on a ventilator. *Id*. at 46. The admitting physician assessed Ms. Henningsen with tetraplegia with cranial nerve involvement of unknown etiology, and her differential diagnosis at that time included TM, neuromyelitis optica spectrum disorder ("NMOSD"), or a vascular event. *Id.* She was evaluated for respiratory failure deemed secondary to quadriplegia. *Id*. at 49.

After arriving at Craig Hospital in January, Petitioner was evaluated by Kori Lehman PA-C and neurologist Maysun Ali, M.D. Ex. 1 at 67. At this point, Ms. Henningsen had no spontaneous movement in all four extremities on exam, flaccid tone throughout and decreased sensation distal to C4. *Id.* at 66. It was also noted the December 8th MRI performed with diffusion seemed to point toward a spinal cord infarct, although TM could still not be fully excluded (and further imaging was not deemed to be warranted). *Id.* at 67. Petitioner was prescribed a low dose of acetylsalicylic Acid (aspirin) "for potential spinal cord infarct," although PA Lehman deemed this "less likely" since there was not evidence of "multiple areas infarct at once." *Id.*

On January 27, 2020, a lumbar puncture revealed that Petitioner's CSF proteins were within range and other laboratory testing yielded normal results. Ex. 13 at 1516. In early February, Petitioner was seen by another neurologist, who took note of the fact that her onset had occurred over a matter of hours, suggesting cord ischemia, but that MRIs showed cord signal abnormality that increased with edema and enhancement, supportive of an inflammatory process as causal. Ex. 1 at 3783. Upon examination, the neurologist did not observe any voluntary movement in petitioner's upper or lower extremities. *Id*. at 3787.

On February 10, 2020, Ms. Henningsen underwent another MRI of her cervical spine, and it revealed extensive diffuse multifocal areas of hyperintensity in the cervical and upper thoracic cord. See Ex. 13 at 1218. The radiologist noted that many of these lesions were "associated with cord volume loss suggest[ing] chronicity." *Id*. Further, many "appear[ed] to predominantly involve the peripheral white matter regions within the cord, which would favor chronic demyelinating disease. Other considerations include[d] neuromyelitis optica although no abnormality [was] seen in the optic nerves." *Id*. at 1219. The following month, another cervical and thoracic MRI was performed, and it did not identify any new or enlarging areas of cord signal abnormality. See Ex. 13 at 854. There was ongoing slight volume loss at C2-T3, but also substantial resolution of prior abnormal enhancement of central gray matter from C3-T3, which may have reflected "evolution of encephalomalacia." *Id*. at 855. This radiologist proposed a cord ischemia insult, given the rapid disease progression revealed from prior MRIs, plus the lack of imaging evidence of brain involvement. *Id*.

On March 27, 2020, petitioner was discharged from Craig Hospital, with a diagnosis of tetraplegia likely due to seronegative NMOSD. See Ex. 1 at 3330. NMOSD was favored "given morphology of long segment transverse myelitis extending up to dorsal medulla and presenting with acute onset tetraplegia and nausea suspected to be due to involvement of area postrema," although other indicia for NMOSD (a funduscopic exam and an MRI of optic nerve) were negative, and thus not supportive of this diagnosis. *Id*. A vascular event was also not ruled out, although repeat spinal angiograms had produced negative results. *Id*. In addition, testing for AQP4-IGG (aquaporin-4 antibodies) was also negative (meaning the possible NMOSD was classified as seronegative). *Id*. Further evaluation for other causes of transverse myelitis were negative, following testing for lipoprotein insulin resistance done by Swedish Medical Center, and CSF cultures and cell counts came within normal limits. *Id*.

*Subsequent Treatment and Neurology Consults*

After discharge, Petitioner made significant improvement in power-wheelchair mobility and medical stability, but nevertheless spent time in a long-term post-acute care medical facility (beginning in late March) for continued rehabilitation. Ex.1 at 3331; Ex. 3 at 31. Petitioner's diagnosis upon admission was tetraplegia secondary to "neuromyelitis optica spectrum disorder versus spinal infarct versus TM," with it being emphasized that her etiology remained unknown. Ex. 3 at 31. She remained in the acute care facility until April 17, 2020, when she was discharged home due to improvement, with the same differential she was provided at her admission. *Id*. at 36; Ex. 4 at 22. Upon discharge, she was in a wheelchair and her tracheostomy tube was capped. *Id*. She was to begin receiving home health nursing and physical therapy. *Id*. at 212.

On May 12, 2020, Ms. Henningsen returned to Craig Hospital for a post-discharge assessment. She was described as a 26-year-old "previously healthy female with C2 ASIA B spinal

cord injury due to likely Seronegative NMOSD." *See* Ex. 1 at 938. Petitioner reported that her right upper extremity was weaker, and over all she felt she had lost some sensation, but other than blurry vision reported no eye concerns. *Id*. at 939. There was no plan in place for neurology follow-up, but it was recommended. *Id.*

Two months later (July 2020—approximately seven months from onset and initial emergency treatment), Ms. Henningsen saw neuro-ophthalmologist Jeffery Bennett, M.D., for an in-person evaluation of "acute onset transverse myelitis." See Ex. 7 at 2.[6] Dr. Bennett noted that the lesions revealed from Petitioner's most recent MRI (performed in March 2020—three months post-onset) appeared more discrete than in prior imaging, and also stated that a cell binding assay for AQB4 antibodies had not been performed, nor was testing performed to assess the presence of oligoclonal bands (which can be a biomarker for multiple sclerosis ("MS")). *Id*. Dr. Bennett's working diagnosis was "post-vaccination TM," and to support this view he referred to "case reports in the literature that describe [post-vaccination TM]," before positing that it was unclear if petitioner had a propensity for autoimmune response. *Id*. But more generally, Dr. Bennett described Petitioner's differential diagnosis as follows:

> [w]hile this could be a seronegative NMO [neuromyelitis optica], her lack of other consistent features outside of LETM [longitudinally extensive TM] makes this less likely. Less likely to be MOG [myelin oligodendrocyte glycoprotein] given severity of insult. *Other diagnoses to consider include spinal cord infarction* vs spinal cord fistula vs alternative inflammatory etiology such as sarcoidosis.

*Id*. (emphasis added).

Dr. Bennett ordered further serum testing for antibodies related to NMOSD (which yielded negative results) and a repeat MRI. Ex. 7 at 2, 11–12. This MRI was performed on August 15, 2020. See Ex. 13 at 728–29. It revealed resolved cord expansion and abnormal enhancement, but also severe cord atrophy below C4 and extending to T2 with myelomalacia, plus possible abnormal signal in a few lower levels. *Id*. at 729. At a follow-up telehealth visit on August 31, 2020, Dr. Bennett discussed the aforementioned findings with Petitioner. He explained that she was clinically stable, and that the MRI demonstrated resolution of the cord edema and secondary cord atrophy. Ex. 7 at 8. He contended that there was "no evidence of an alternative non-inflammatory cause of spinal cord injury." *Id*. Dr. Bennett assessed Petitioner with TM. *Id.*

---

[6] Dr. Bennett's treatment of Petitioner appears to have been limited to "an outpatient history and examination on July 27,2020, [and] a telehealth conference on August 31, 2020," along with some records review. *See* Report, dated February 24, 2022, filed as Ex. 16 (ECF No. 17-1).

Petitioner has since continued to be treated for her debilitating condition. *See,* e.g., Ex. 151. Despite the catastrophic impact of her illness on her life, Petitioner has endeavored to find ways to lead as productive an existence as possible. In March 2024, for example, she had completed a master's program, and was preparing for a social work exam. *Id*. at 7.

## II.    Hearing Witnesses

Both sides offered the testimony of three kinds of experts: a clinical neurologist; a radiologist and/or expert in the reading and interpretation of MRI results; and finally an immunologist to comment on the underlying causation issues in this case. I address herein only the expert opinions and testimony bearing on the outcome.[7]

### A.    *Fact Witness – Alice Henningsen*

Petitioner was the only fact witness to testify at hearing. *See generally* Transcript, filed June 20, 2025 (ECF No. 91) ("Tr.") at 7–31. Prior to October 2019, Petitioner worked for Comcare, a community mental health organization, in the Youth Services branch, and volunteered at the Wichita Area Sexual Assault Center ("WASAC"). *Id.* at 8. At Comcare, Petitioner would meet with children "to develop and work towards their treatment goals", and for WASAC, she worked the 24-hour crisis response line, as well as provided advocacy to survivors of sexual assault in a hospital setting. *Id.* In addition, Petitioner was attending school to obtain a master's degree in social work. *Id.* at 9. She described her typical week—noting how incredibly busy it was with being a student, working/volunteering, all while maintaining an active lifestyle and partaking in hobbies such as attending live music and spending time with friends. *Id.* And she emphasized the lack of any restrictions preventing her from doing her activities of daily living. *Id.* at 10.

She briefly recounted the day she received her flu vaccine on October 31, 2019, explaining that it was her first time receiving the flu shot. Tr. at 10. She then spent some time discussing the state of her mental health while hospitalized and noting how severely impacted it was.[8] Specifically, Petitioner suffered from "ongoing panic attacks" that would last all day, and oftentimes she would "count the minutes until [she] would receive medication that would help with [her] anxiety." *Id.* Moreover, the physical pain was so bad that at times it would take her breath away. *Id.* Petitioner further stated that she would completely disassociate for "weeks on

---

[7] I thus do not summarize the testimony of either side's immunologic experts—Drs. Steven Bradfute and William Hawes—whose testimony primarily pertains to the "can cause" prong for causation. My decision turns on the issue of diagnosis, as well as whether the flu vaccine likely *did cause* Petitioner's injury (assuming it was TM, and that TM could be vaccine-caused).

[8] Throughout her testimony, Petitioner emphasized how much she struggled mentally and the overall mental strain the panic attacks and her paralysis had on her. *See, e.g.*, Tr. at 11, 14, 16, 18.

end" as a result of being caught in such a traumatic experience without the ability to fight or flee. *Id.* at 11.

Petitioner remained in the hospital ICU for approximately one month before being transferred to an inpatient rehab facility at Craig Hospital for an additional three months. Tr. at 13, 14. While in rehab, Petitioner had to relearn many basic skills of living, such as eating, swallowing, breathing without assistance, as well as positioning herself properly in bed or in her chair. *Id.* at 13. She then was discharged and transferred to a skilled nursing facility for approximately two weeks. *Id.* at 14. Following her stay at the skilled nursing facility, Petitioner was eventually discharged to her mother's home where she required in-home healthcare assistance in addition to the support her mother provided.

Petitioner attempted to return to school in the spring of 2021 to complete her last semester but lacked the technological support to successfully do so at that time. Tr. at 17. She later returned to school in the summer of 2023, and graduated that December with a degree in psychology followed by a master's in social work. *Id.* at 20. Petitioner currently works part-time as a therapist, seeing clients regularly and assisting them with their treatment plans and goals. *Id.* In addition, Petitioner provides "safety plans for clients that have high acuity, meaning they have a long history of suicidal ideation or attempts or high incidence of self-harm." *Id.* During her testimony, Petitioner further noted that her overall career path changed due to her injury as it was not feasible for her to pursue case management like she originally hoped.

Petitioner concluded her direct testimony describing her current living situation and explaining the various challenges she faces with living alone, navigating her apartment complex, and adjusting her schedule when aides call in sick, etc. She continues to rely heavily on home health aides twice a day for approximately two to three and a half hours at a time. Tr. at 22. Petitioner stated that she has gotten more comfortable with leaving her house to visit family and friends, but that she rarely is able to travel since her injury. *Id.* at 27. Overall, Petitioner emphasized the impact her injury has had on her quality of life—noting that she has been stripped of "some of the most meaningful parts of [her] life" such as her independence and ability to be self-sufficient; however, she tries her hardest to focus on what she can do. Tr. at 29.

      B.    *Petitioner's Experts*

      1.    <u>Dr. Andrew Pachner</u> – Dr. Pachner is a neurologist, and he testified at hearing and prepared three expert reports on Petitioner's behalf. Report, dated Jan. 23, 2023, filed as Ex. 62 (ECF No. 31-1) ("First Pachner Rep."); Report, dated Feb. 19, 2024, filed as Ex. 108 (ECF No. 55-1); Report, filed Oct. 7, 2024, filed as Ex. 158 (ECF No. 64-9).

Dr. Pachner attended Yale College for his undergraduate degree, and Yale University School of Medicine for his medical degree. Curriculum Vitae, filed as Ex. 63 (ECF No. 31-2) ("Pachner CV"); Tr. at 33. He then completed an internship and residency in Internal Medicine at Johns Hopkins Hospital, followed by fellowship and chief residency position in Neurology at Yale-New Haven Hospital. *Id.* He has held several academic appointments and currently serves as the Murray B. Bornstein Professor of Neurology in the Department of Neurology, as well as the Director of the Multiple Sclerosis Center, at Darthmouth-Hitchcock Medical Center and Geisel School of Medicine. Pachner CV at 2; Tr. at 34. Dr. Pachner is board certified by the American Board of Psychiatry and Neurology in Neurology with added qualification in Neuromuscular Medicine. First Pachner Rep. at 1; Tr. at 34. He has published extensively in the areas of Neuroimmunology and Neuroinfectious disease. Tr. at 37; Pachner CV at 22–35. Dr. Pachner admitted his expertise ran more to neurologic matters than with respect to strokes, although he noted he had in his professional career been involved in treatment of some spinal cord infarcts. Tr. at 98–99, 460–61; First Pachner Rep. at 1.

Dr. Pachner began his testimony explaining some of the medical concepts relevant to the parties' diagnostic dispute. He slightly differentiated between a "myelopathy" (which he defined to mean "any damage to the spinal cord causing clinical symptoms," such as would result from the mechanical harm due to a vertebral disc herniation), and "myelitis" (meaning "damage to the spinal cord caused by inflammation"). Tr. at 38, 39. It was the later kind of harm that Petitioner had likely experienced, he proposed (with myelitis essentially a subset of myelopathy). *Id.* at 39. TM was a form of myelitis involving inflammatory harm "across the whole width" of the spinal cord (and hence distinguishable from a more limited, localized harm). *Id.* The location of such neuroinflammatory harm was "critical for trying to understand the clinical sequelae of the damage." *Id.*

TM, in Dr. Pachner's view, was the proper diagnosis for Petitioner's illness. Tr. at 45. And he reached this conclusion even while allowing that infarct had been appropriately included in Petitioner's overall differential diagnosis. *Id.* at 46–47. To substantiate the diagnosis, Dr. Pachner referenced current criteria applied to TM, endeavoring to show that the required elements were all satisfied. *Id.* at 48–49; G. Barnes, et al. (on behalf of "Transverse Myelitis Consortium Working Group"), *Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis,* 59 Neurol. 499 (2002), filed as Ex. 18 (ECF No. 17-3) ("Working Group Criteria"). As Dr. Pachner noted, Ms. Henningsen had "bilateral signs or symptoms," (Tr. at 49), and a "clearly defined sensory level" (meaning her clinical sensory issues corresponded to the location of inflammation on the cord (Tr. at 49–50)). He also noted (as reviewed in more detail below) the evidence from CSF testing for inflammation (here an elevated white blood cell count), along with MRI enhancement (which confirmed compromise of the blood-brain barrier). *Id.* at 51–52. Dr. Pachner highlighted as well the fact that the TM diagnosis had been embraced by treating physician Dr. Bennett, whom he characterized as "one of the preeminent neuroimmunologists in the world." Tr. at 47.

At the same time, certain exclusionary factors that would disfavor a TM diagnosis were absent. Tr. at 56. For example, there was no evidence of a compressive etiology (due to a vertebral disc). *Id*. at 50. Petitioner had been exposed to no spinal radiation. *Id.* at 53. There was no evidence of arteriovenous malformations. *Id.* at 55. There was an absence of evidence of an infectious explanation for the inflammation, no proof Petitioner had experienced a systemic autoimmune disease, and no way to attribute the spinal cord issues to a different kind of CNS neuropathic disease, like MS. *Id.* at 55–56.

Dr. Pachner also maintained that the evidence of inflammation (as seen in the MRI images) did not appear to be "confined" to the anterior spinal artery section of the cord. Tr. at 53–54, 74, 77–78. This kind of territorial "grouping" of inflammation was, Dr. Pachner maintained, "the most common, by far, cause of . . . spinal cord stroke." Tr. at 53. That aspect of the spinal cord was oriented to motor nerves, rather than sensory—and transverse myelitis would usually involve "the posterior part [of the cord], which predominantly carries sensory modalities." *Id.* at 54. Thus, the "vast majority [of infarct patients]" experience sparing of sensitivity to "vibration and position sense," while TM patients have all "sensory modalities" impacted (since the TM-associated inflammation is not confined). *Id.* at 74. Yet Petitioner appeared in neurologic exams to have lost vibration sense—inconsistent with an infarct. *Id.* at 75. In reaching this opinion, however, Dr. Pachner relied somewhat on Dr. Bajakian's interpretation of the imaging, although he noted that this exclusionary criteria involved clinical evidence of "deficits." *Id.* at 54–55, 76.

Imaging results further supported TM as the proper diagnosis. Tr. at 72–78. For example, there was evidence of signal enhancement in some images—something more usually characteristic of TM (although it was "not obviously impossible" for an infarct). *Id.* at 72, 73. Dr. Pachner also highlighted the fact that imaging of infarcts usually reveals "shorter involvement" of the cord, longitudinally—but in this case, imaging revealed "extensive involvement of the spinal cord all the way down to the thoracic cord," more consistent with TM (although Dr. Pachner admitted that length could occur in the context of an infarct as well). *Id.* at 76, 77. And the mere location of the lesion, as revealed in imaging, was characteristic of TM. *Id.* at 77. Infarcts were usually seen "in the mid to lower thoracic cord," while TM lesions occurred "in the cervical and upper thoracic cord." *Id.* at 77, 108 (stating that "vast majority" of infarcts are below cervical region).

Dr. Pachner provided greater detail as to why he believed Petitioner's initial, clinical course was consistent with acutely-presenting TM. As he noted, the diagnostic criteria required evidence of "progressive worsening to nadir" (meaning "lowest level of damage that occurs) occurring within 4 hours to 21 days. Tr. at 52; Working Group Criteria at 500 Table 1. This had happened in Petitioner's case. Tr. at 53. Petitioner had reported first experiencing back pain and shoulder tightness the evening of December 7, 2019. Tr. at 57–58. By the next day (December 8th at 11:15 am), the pain returned along with bilateral arm and back numbness/tingling, and it worsened in

11

two hours, progressing to an inability to move and ultimately evidencing quadriplegia. *Id.* (Dr. Pachner later admitted that early treaters were unsure as to the precise nature of Petitioner's injury, and reasonably not only included infarct in the differential but even included some possible initial treatment for it. Tr. at 465–66).

In Dr. Pachner's view, Petitioner's progression continued downward through the next day (December 9th). Overnight, she experienced breathing difficulties that required attention on the 10th, which Dr. Pachner considered evidence that "the process that was affecting her spinal cord had moved up to the breathing centers in her spinal cord" and requiring intubation. Tr. at 60. Dr Pachner viewed this as a significant negative change in Petitioner's progression. *Id.* at 61. Thus, by this time, a few days had passed—long enough to fit the timeframe for TM, but less acute than what would be expected for an infarct. *Id.* at 63.

In so opining, Dr. Pachner rejected the conclusion of Respondent's experts that progression to nadir had unfolded more rapidly, over the space of no more than four or five hours. Tr. at 60–63. A shorter progression would, he admitted, be more associated with infarcts. *Id.* at 66 ("within minutes to a few hours"). But Dr. Pachner favored an onset of somewhere between five hours and two days, based on his belief that nadir was actually reached *after* December 8, 2019. Tr. at 106–08, 468–70. As he stated, "it wasn't until later that her work of breathing was felt to be so impaired that she needed to be intubated. But that was not true earlier in her course." *Id.* at 470. He also noted literature offered as evidence of the diagnostic criteria for a spinal cord infarct. N. Zalewski et al., *Characteristics of Spontaneous Spinal Cord Infarction and Proposed Diagnostic Criteria,* 76 JAMA Neurol. 1:56 (2018), filed as Ex. E-1 (ECF No. 41-2) ("Zalewski"). Zalewski included a temporal criterion of "onset to nadir deficits 12 h or less," but the timeframe here was plainly longer, in Dr. Pachner's opinion. Tr. at 63; Zalewski at 60 (Box). Nevertheless, Dr. Pachner contended, a rapid symptoms progression could still occur in a very short time and be consistent with TM. *Id.* at 467–68; Working Group Criteria at 500 Table 1.

By contrast, Dr. Pachner denied that a number of criteria relevant to a spinal cord infarct had been established. For example, Petitioner was not in the cohort of individuals old enough to be at risk for stroke. Tr. at 65. She also lacked many of the other associated health risk factors for a vascular event, such as "diabetes, hypertension, [or] hyperlipidemia . . ." *Id.* In addition, TM usually impacted the cervical section of the spinal cord (in the neck, from the base of the skull to the start of the upper back),[9] affecting the arms and legs (and thus presenting sometimes with quadriplegia), whereas an infarct would occur in a lower spinal cord segment. *Id.* at 66–67.

The CSF testing results also supported TM, in Dr. Pacher's view. Tr. at 67–72. Dr. Pachner proposed that "the medical literature is pretty much unanimous that anything over five white

---

[9] *See* Park at 7 (stating that "TM on the other hand, is mainly distributed across the cervical and upper thoracic levels.").

[blood] cells per microliter is abnormal and indicative of an inflammatory or infectious process within the spinal fluid." *Id.* at 68; R. Fishman, "Composition of Cerebrospinal Fluid," in *Cerebrospinal Fluid in Diseases of the Nervous System* (1980), filed as Ex. 161 (ECF No. 75-2) ("Fishman"), at 175 ("a [WBC] count greater than 10 cells per mm$^3$ is pathognomic of disease in the central nervous system").[10] And there was a high correlation between white blood cell count in CSF testing and TM. Tr. at 69; S. Al Deeb et al., *Acute Transverse Myelitis: A Localized Form of Postinfectious Encephalomyelitis,* 120 Brain 1115 (1997), filed as Ex. 70 (ECF No. 31-9) ("Al Deeb"), at 1120 (finding CSF results were abnormal in 94 percent of 31 patient sample, although WBC count levels correlated less to outcome than protein levels). Here, Petitioner's testing revealed 11 white blood cells—a number that was "clearly abnormal" in Dr. Pachner's view, even if it was not notably "massive" either. Tr. at 70, 71. Dr. Pachner also proposed that the testing hospital applied an overly-expansive testing range (zero to *ten* as normal) that undervalued the significance of Petitioner's result. *Id.* at 71–72, 110 (deeming range applied by testing hospital in this case too improper).

Dr. Pachner denied that the level of pleocytosis should be much higher for TM (due to the neuroinflammation in the cord that it would reflect), contending that "there's essentially no correlation between the extent of inflammation in the parenchyma of the brain and what you see in CSF," and noting that MS patients often have "incredible inflammation" in their brains but reveal low-elevated white blood cell levels (although this case does not involve brain lesions, or MS for that matter). Tr. at 470, 471. An active spinal cord infectious process, such as the kind of bacterial infection resulting in meningitis, might reveal high levels of white blood cells in CSF testing, but "when the inflammation is limited to the parenchyma, . . . there's frequently no correlation." *Id.* at 471.[11]

On cross-examination, Respondent questioned Dr. Pachner about some of his contentions regarding clinical or testing factors in this case favoring TM over an infarct. *See generally* Tr. at 98–123. Dr. Pachner admitted that according to the Working Group Criteria, evidence of inflammation (whether from CSF testing or enhancement seen in imaging) needed to be present at time of onset or within seven days thereafter. *Id.* at 101; S. Beh et al., *Transverse Myelitis,* 31 Neurol. Clin. 79 (2013), filed as Ex. A-1 (ECF No. 22-2) ("Beh"), at 98 Table 8. Here, however,

---

[10] Fishman, as filed in this case, appears to be a single page from a larger text. Not only is it not a particularly recent publication, however, but the cited page also states as follows: "[a] pleocytosis of 5 to 50, 50 to 200, or more than 200 white cells is graded as mild, moderate, or marked, respectively." Fishman at 175. Thus, even if Dr. Pachner was correct in his contention that a cell count of 11, as here, was evidence of CNS inflammation, that total count constitutes only a low-range "mild" degree of inflammation, at least as defined by Fishman.

[11] Dr. Pachner's direct testimony also included explanations for how the flu vaccine could cause TM. Tr. at 80–82, 84–95. But the resolution of this claim does not turn on a "can cause" analysis, and I do not therefore include an in-depth review of this aspect of his opinion. Dr. Pachner did admit that a "substantial proportion" of TM cases are idiopathic in origin (*Id.* at 100), and that he lacked specific immunologic expertise. *Id.* at 110–12.

Petitioner's initial WBC testing revealed normal results, and a re-test of the CSF did not later show even mild levels of inflammation until about *ten days* post-onset. *Id.* at 102. But Dr. Pachner denied this elapse of time in excess of the testing interval set forth in Beh was relevant, deeming the seven-day timeframe artificially short, in order to exclude longer periods (and he also opined it was likely that if Petitioner *had* been tested in the period between December 8th and 18th, her WBC levels would likely have been high since her nadir occurred in that timeframe). *Id.* at 102–03, 104.

Dr. Pachner was later called back to the stand for Petitioner's rebuttal case, and he addressed several of Respondent's arguments. He contended that Respondent over-relied on Zalewski for the proposition that infarcts were very commonly misdiagnosed as TM, maintaining that the article fell victim to referral bias. Tr. at 461–62. The patients evaluated in Zalewski were unique cases seen at the Mayo Clinic due to their diagnostic complexity, and therefore were not representative of the "vast majority" of TM patients seen is less specialized medical environments (whose diagnoses were likely easier to ascertain). *Id.* at 462. At most, Zalewski reflected the fact that diagnosing TM could be difficult (although Dr. Pachner added that he would not himself have found it necessary to refer Petitioner to a place like the Mayo Clinic for more diagnostic specificity under the circumstances). *Id.* at 463–64.[12] (Of course, this overall argument somewhat flies in the face of the fact that *this case* itself is illustrative of the very degree of diagnostic complexity that Zalewski's authors were addressing).

Dr. Pachner also endeavored to highlight a purported factual dispute between the radiologic experts as to the nature of Petitioner's neurologic deficits, and what that said about the proper diagnosis. He contended that while "the deficit and the imaging all was consistent with a lot more than just the anterior spinal artery distribution," Respondent's own experts[13] disagreed as to whether evidence of spinal cord harm in this case was territorially limited to one portion of the cord or had impacted the cord more indiscriminately. Tr. at 465. In Dr. Pachner's view, infarct was more likely to impact only the anterior portion of the cord – as assumed by treaters close-in-time to Petitioner's initial presentation, who noted no sparing of vibration sensation – so a more expansive injury was less compatible with infarct. *Id*.

---

[12] Dr. Pachner also noted that Petitioner had received a "good second look" at her diagnosis—both when treaters endeavored to rule out the possibility of neuromyelitis optica, and then later, when she saw Dr. Bennett in 2020. Tr. at 464.

[13] The question posited to Dr. Pachner that elicited this testimony assumed that while Respondent's diagnostic expert, Dr. Price, had testified that he believed cord damage in this case was not limited to the anterior territory, Dr. Zucconi (Respondent's radiologic expert) had proposed a more limited cord territorial impact. Tr. at 465. In fact, although Dr. Zucconi emphasized that (as evidenced by earlier imaging) he considered the central gray matter in the cord (which he deemed the "most sensitive area to ischemia" (Tr. at 238)) impacted *primarily,* this is not the same as concluding that only one territorial portion of the cord was affected. It also is not inconsistent with the fact that infarcts *often* are limited to the anterior part of the cord (something that can be corroborated by the presence of vibration sensitivity "sparing," since that neurologic function comes from a different part of the cord). *Id.* at 346–47. But it has not been shown in this case that infarcts *only* occur in the anterior of the cord (any more than it would be true that TM can *never* occur in the same rapid timeframe as what Petitioner experienced).

14

2.      *Dr. Richard L. Bajakian* – Dr. Bajakian is a neuroradiologist, and he offered an opinion (both via written reports and testimony) arising from his interpretation of the various MRI findings obtained during Petitioner's treatment course. Report, dated Jan. 30, 2023, filed as Ex. 44 (ECF No. 30-1) ("First Bajakian Rep."); Report, dated July 20, 2023, filed as Ex. 96 (ECF No. 45-1) ("Second Bajakian Rep."). Dr. Bajakian overall opined that Petitioner's imaging results were most consistent with some form of TM-like inflammatory myelopathy. Tr. at 132.

Dr. Bajakian attended Syracuse University for his undergraduate degree, and New Jersey Medical School for his medical degree. Curriculum Vitae, filed as Ex. 45 (ECF No. 30-2) ("Bajakian CV") at 1; Tr. at 129. Thereafter, he completed an internship at Monmouth Medical Center and his residency in Diagnostic Radiology at Morriston Memorial Hospital. Bajakian CV at 1; Tr. at 130. Dr. Bajakian also completed a fellowship in Neuroradiology at Brigham and Women's Hospital. *Id.* He held several academic appointments, as well as opened an outpatient MRI center in 2001 with another physician. Tr. at 131. Dr. Bajakian eventually sold his practice in 2021 and no longer practices clinical medicine since October 2022. *Id.* He further estimated that over the course of his career, he has reviewed approximately 100,000 to 200,000 MRIs of the cervical, thoracic, and lumber spine. *Id.* at 131–32. Dr. Bajakian was board certified by the American Board of Radiology with a subspeciality in Neuroradiology. First Bajakian Rep. at 1.

Dr. Bajakian framed his imaging opinions with an explanation of the distinction between TM and a spinal cord infarct. Tr. at 133–40. He characterized infarcts as "fixed" lesions reflecting specific areas of cord death—in contrast to a myelitis, which is "a much more dynamic process" due to its inflammatory origin. *Id.* at 133. He noted that three blood vessels "feed" the spinal cord— an anterior artery (on the front of the body) and two posterior arteries. *Id.* at 134–35. Most spinal cord infarctions would involve a "sing[ular] vascular territory," would not be visible from initial imaging, are usually not "longitudinally extensive," and would not enhance (or if so only faintly). *Id.* at 137–38. TM, by contrast, will involve "signal abnormality on presentation," with enhancing lesions that are extensive ("spanning more than three [spinal] segments"), and that are not as confined, involving "gray and white matter indiscriminately." *Id.* at 138.

In addition, Dr. Bajakian maintained that infarcts were more commonly limited to the thoracic region of the spine, whereas TM is mostly cervical or cervical/thoracic. Tr. at 191. And cord swelling and edema generally were not common to infarct (noting that even in articles like Zalewski specific to diagnosing infarcts, only a fifth of the patients studied experienced swelling and edema). *Id.* at 280–81; Zalewski at 59 Table 2. By contrast, Dr. Bajakian contended, "vasogenic edema" would more commonly be seen with TM, another product of the neuroinflammation driving it. *Id.* at 281.

15

Another overarching factor that Dr. Bajakian deemed significant in interpreting MRI studies to support infarct versus TM was the presence of enhancement. Although he allowed that infarct imaging could feature enhancement, this was not their "typical pattern." Tr. at 189. In addition, any enhancement present should not cross "multiple vascular territories," and should more often than not be faint. *Id;* Zalewski at 62. Where (as here, in Dr. Bajakian's opinion) the imaging revealed greater spinal cord involvement, and TM became a more likely diagnosis. Tr. at 189–90. (Later on, however, Dr. Bajakian contended that "pencil-like hyperintensities" seen on some of the images in question in this matter—especially some of the initial imaging—were *not* necessarily specific to infarcts, and he seemed to give more weight to evidence of multiple vascular territory enhancement as proof of TM). *Id.* at 191–92).

Dr. Bajakian subsequently provided commentary on the critical sequence of imaging in this case. (For ease of analysis and review, I address this portion of his testimony according to the image sets in question):

(a)     First December 8, 2019 Images – Dr. Bajakian noted that imaging of the cervical cord from the afternoon of December 8th demonstrated "increased signal centrally within the spinal cord," noting what he saw as indicia of cord swelling at this time. Tr. at 141, 276. He considered this result to be abnormal, and to evidence diffuse inflammation, impacting the anterior *and* posterior spinal cord and with proof of the kind of longitudinally-extensive signal (from the C3 to T2 level—seven segments) common to inflammatory myelopathies. *Id.* at 142. (These initial images did not involve the use of contrast, so no enhancement of signal abnormalities could be detected in them).

TM, Dr. Bajakian contended, was more likely to present with this kind of proof of signal abnormality than an infarct. Tr. at 145–46; C. Alblas et al., *Acute Spinal-Cord Ischemia: Evolution of MRI Findings,* 8 J. Clin. Neurol. 218 (2012), filed as Ex. 46 (ECF No. 30-3) ("Alblas"), at 222 (imaging usually normal in acute phase of ischemia compared to myelitis). He later referenced other literature specific to infarct supporting the view that no abnormal signal might be evident even within 12 hours of an infarct's onset. Tr. at 201–02; D. Park et al., *Spinal Cord Infarction: A Single Center Experience and the Usefulness of Evoked Potential as An Early Diagnostic Tool,* 11 Front. Neurol. 1 (October 2020), filed as Ex. 59 (ECF No. 30-16) ("Park"), at 3, 5 Table 3 (noting that of 14 cases of patients with spinal cord infarct, nine had no evidence of T2 signal intensity in initial imaging performed within 12 hours of onset). Park also noted, however (since *all* of its sample patients later showed DWI results consistent with infarct), that the lack of initial imaging evidence supportive of infarct likely meant that "it is not easy to diagnose [infarct] based on an initial T2 image"—*not* that the lack of such evidence in initial imaging counseled against an infarct diagnosis entirely. Park at 8.

Early swelling of the cord was also consistent with TM more than infarct. Tr. at 188, 276. And Dr. Bajakian directly contested the view of Respondent's neuroimmunologist, Dr. Zucconi, that swelling was not yet present (but showed up later). Although he allowed that there was evidence of a "fuller" cord at the C3-C4 level, he denied it could be attributable to a "partial voluming effect," because if so, the fullness should have been more broadly evident. *Id.* at 276–77.

Dr. Bajakian disagreed with the contemporaneous radiologic treater who deemed these initial results normal—an opinion that he correctly noted he shared with Respondent's imaging expert (Dr. Zucconi). Tr. at 143–45. Dr. Bajakian allowed for the reasonableness of Dr. Zucconi's observation that the initial image revealed a "pencil-like hyperintensity" (an indicia of infarct), but disputed its pertinence, maintaining that both clinically and radiologically, there was evidence of "posterior spinal cord involvement," rather than the territorial limitation to the anterior cord that would be expected for an infarct. Tr. at 147.

(b)    Second December 8, 2019 Images – For the next round of imaging, performed later in the evening of December 8th, treaters had employed DWI, which Dr. Bajakian explained can help reveal the presence of "areas of dead or dying cells." Tr. at 149. (Dr. Bajakian did not expressly acknowledge, however, that DWI is most *commonly used* to evaluate the presence of an infarct. *Id.*; *see also* K. O'Connor et al., *"Dazed and Diffused": Making Sense of Diffusion Abnormalities in Neurologic Pathologies,* 86 Br. J. Radiol. 1 (2013), filed as Ex. 52 (ECF No. 30-9) ("O'Connor"), at 1 (stating that "the best known use of [DWI] in MRI of the brain is detection of acute vaso-occlusive infarct"); Y. Kim et al., *The Role of Diffusion-Weighted MRI in Differentiation of Idiopathic Acute Transverse Myelitis and Acute Spinal Cord Infarction,* 65 J. Korean Soc. Radiol. 2:101 (2011), filed as Ex. 97 (ECF No. 46-1) ("Kim"), at 105 (noting "[t]he usefulness of DWI in spinal cord infarction has been demonstrated in several papers," and differentiating infarct from TM is important for treatment purposes)). Dr. Bajakian nevertheless questioned whether the DWI technique results favored infarct (as proposed by Dr. Zucconi), saying he did not detect in the relevant image evidence of sufficient white-dark contrast needed to suggest the presence of dead tissue areas, and that he felt the evidence of increased signal favored the posterior portion of the cord—meaning "not in a single vascular distribution." *Id.* at 151, 154.

In support of this argument, Dr. Bajakian cited O'Connor, which observed that acute MS plaques in the brain commonly demonstrate DWI signal, thus underscoring the fact that "[o]ther things can have restricted diffusion." Tr. at 152; O'Connor at 7. O'Connor does not, however, expressly state this, and only discusses MS lesions in the specific context of *brain MRI results*. Tr. at 196; *see generally* O'Connor. Since this case involves spinal cord and not brain lesions, comparisons to the utility and function of brain-oriented MRIs employing the DWI technique shed little light on what DWI reveals with respect to the spine.

17

Dr. Bajakian also cited Kim as supporting his argument that DWI was not necessarily only relevant to establishing the presence of infarct. Kim's authors concluded that TM "usually does not demonstrate restricted diffusion, which can be a clue to differentiate it from [infarct], … [but] idiopathic ATM with larger segment involvement can show focal diffusion restriction." Kim at 101; Tr. at 153. (Kim also notes, however, that "[i]n most cases of [acute transverse myelitis], diffusion restriction was not identified," whereas it is "noted in most [infarct] cases") (Kim at 106)). TM featuring diffusion restriction was nevertheless consistent with what Petitioner likely experienced, Dr. Bajakian opined. Other literature also filed in the case was, he contended, consistent in concluding that positive DWI findings could be seen in connection with demyelination due to inflammation. Tr. at 153–54 (citations omitted). Later in his testimony, Dr. Bajakian took the more maximalist view that the kind of restrictive diffusion disclosed in DWI imagining "can be seen in many diseases," and therefore has less specific diagnostic value. Tr. at 192–93.[14]

Besides downplaying the significance of the DWI findings, Dr. Bajakian emphasized the situs of diffusion observed on this MRI. He deemed it inconsistent with an anterior cord infarct, since there was evidence of some increased signal "all the way to the back of the cord." Tr. at 154. He also addressed the extent to which (as Dr. Zucconi contended) this imaging revealed "preferential disease in the distribution" (favoring the gray matter, which is understood to be more impacted by infarct). *Id.* at 155, 282. Dr. Bajakian accepted that "the central gray is more sensitive to ischemia," but added that too much of the "vascular territories" were impacted to deem an infarct had occurred (which would more commonly be "confined to a solitary vascular territory"). *Id.* at 155, 156. And TM could involve evidence of lesions in both white *and* gray matter. *Id.* at 156 (citation omitted), 282.

The number of affected spinal segments evident from this imaging event was additional proof favoring TM over infarct, in Dr. Bajakian's view. Tr. at 157–58. Seven cord segments were involved at this early stage in Petitioner's presentation, consistent with TM (since the cord "has a lot of collateral flow that helps to protect longitudinally extensive infarcts," but which cannot stop the progression of inflammation as easily). *Id.* at 158. Longer lesions, Dr. Bajakian maintained, were more generally associated with TM than infarcts. *Id.* at 190–91; Park at 7 Figure 3 (depicting comparison of 14 infarct patients versus 15 TM patients and revealed the latter had longer lesion lengths). And enhancement (which Dr. Bajakian opined appeared to be impacting the whole of the cord) could also be seen in this imaging, which would be a "very atypical first spinal cord infarct." *Id.* at 159.

---

[14] This tendency to rule out any kinds of diagnostic findings as supportive in this case of infarct (while over-valuing findings that are non-specific, or not wholly inconsistent with TM) undercut the probative strength of Dr. Bajakian's testimony as a general matter, as discussed below.

18

Dr. Bajakian also referenced the brain MRI performed on December 8th, the results of which he deemed inconsistent with an infarct. He noted that vascular aspects of the upper spinal cord would feed a number of brain components, and therefore emboli—"the most common cause for spinal cord infarct, especially in young people" like Ms. Henningsen—should be potentially evident in the brain (where they could cause infarcts as well). Tr. at 162. But such a finding was absent from the brain MRI, undermining infarct (at least indirectly). *Id.*

Other features of this set of MRI images were, in Dr. Bajakian's view, inconsistent with Dr. Zucconi's opinion. Dr. Bajakian denied, for example, that there was any evidence in this set of images suggesting an explanation for infarct (i.e., disc protrusion). Tr. at 277. Rather, in Dr. Bajakian's view the image at most revealed "mild bulging" (as confirmed by the treater who performed the MRI), and was not the kind of herniation that would be capable of causing an infarct. *Id.* at 277–79. Nor did Dr. Bajakian agree that the cause of the infarct could have been a fibrocartilaginous embolism, since the imaging again did not establish the kind of foundational circumstances for such an occurrence. *Id.* at 279–80. Overall, Dr. Bajakian argued, by this time on December 8th imaging was most consistent with TM. "Differential Diagnosis of SCI and TM" Chart (litigation demonstrative aid), filed as Ex. 171 (ECF No. 87-3).

(c)    December 10, 2019 Imaging Results – Dr. Bajakian deemed these results to reveal that "the entire spinal cord from front to back is abnormal," with no evidence at all of sparing (which he assumed would occur with an infarct). Tr. at 163, 164 (deeming the cord involvement to be close to 90 percent). He also observed hyperintense abnormal signaling higher up the cord, in places, plus evidence of a central "hypointense nodule" that he proposed was consistent with TM. *Id.* at 165. And even if there was some higher cord evidence of abnormality specific to gray matter, the shaping and posterior locality was not in Dr. Bajakian's view consistent with the distribution characteristic of an anterior spinal cord infarct. *Id.* at 166.

In addition, Dr. Bajakian stressed that these images did not reveal evidence of secondary, vertebral artery infarcts (which could often be seen in follow-up imaging) that would confirm an initial spinal cord infarct (although their absence does not negate the possibility of a spinal cord infarction). Tr. at 166–68, 187–88, 204; J. Faig et al., *Vertebral Body Infarction as a Confirmatory Sign of Spinal Cord Ischemic Stroke: Report of Three Cases and Review of the Literature,* 29 Stroke (AHA J.) 239 (1998), filed as Ex. 55 (ECF No. 30-12), at 243 ("it is a strong argument for spinal ischemia if there is an evolution of signal abnormalities in a vertebral body associated with spinal cord syndromes at an appropriate level").

(d)    December 18, 2019 Imaging – Dr. Bajakian opined that the repeat cervical MRI performed at this time did not reflect the kind of "enhancement pattern" characteristic of an infarction, but was instead atypical for infarction. Tr. at 168–69. Enhancement of infarction imaging usually produced evidence of a "faint thin line in the anterior artery vascular territory."

*Id.* at 169. Here, however, there was "diffuse enhancement of the entire spinal cord along its margins," "with just a small area of peripheral preservation"—thus establishing total cord inflammation. *Id.* at 169, 170–71. An anterior spinal cord infarct would not only be more limited in enhancement, but would reveal sparing in the non-anterior areas—thus imaging revealed harm that was "not respecting a vascular territory." *Id.* at 171. And at higher cervical levels, the anterior territory was not even involved. *Id.* at 171–72.

The treater who performed/interpreted this set of images had opined that the gray matter involvement in the upper thoracic-imaged regions of the spine was likely supportive of an infarct, but Dr. Bajakian disagreed. Tr. at 172, 190. He emphasized in reaction the fact that (a) imaging suggested whole cord involvement (and not simply gray matter), including the posterior cord, and (b) the area highlighted by the interpreting treater revealed (in Dr. Bajakian's opinion) no enhancement or diffusion abnormality, let alone in the anterior cord. *Id.* at 173. In effect, Dr. Bajakian contended, this reading of this set of images relied on only a partial view of the whole set. *Id.* And otherwise it was incorrect to assume that the "indiscriminate" nature of myelitis neuroinflammation could not impact the gray matter, even if infarcts more usually were limited in this respect. *Id.* at 173, 190.

DWI imaging performed at this time in December was also, Dr. Bajakian maintained, less supportive of infarct over TM. Diffuse signal could now be seen throughout the cord, in both "anterior and posterior spinal artery vascular territories"—not the more restricted/limited kind of abnormality Dr. Bajakian seemed to believe was characteristic of an infarct. Tr. at 174–75. Dr. Bajakian deemed this set of imaging to be more valuable from a diagnostic standpoint than DWI imaging previously performed on December 8th. *Id.* at 176. And he highlighted a suggestion in the imaging interpretation report that DWI-associated findings were new, not a persistently-observed phenomenon. *Id.* at 281. In fact, they were not even discussed in the December 8th imaging studies. *Id.* at 281–82.

Dr. Bajakian took issue with Dr. Zucconi's interpretation of this imaging, with how Dr. Zucconi downplayed signal abnormalities as connected to evidence of diffusion restriction, and otherwise maintained that general cord swelling could explain the results. Tr. at 176–77. Dr. Bajakian argued that the kind of edema associated with TM was more likely the explanation for swelling than infarct, and that the images in question did not support the latter. *Id.* at 177–79. He also on rebuttal contended that Dr. Zucconi's emphasis of evidence of upper/cervical cord inflammation, with an infarct below, made no sense, complicating a medical picture that was more easily and correctly viewed as a single inflammatory process. *Id.* at 280.

(e)    Subsequent Imaging – Dr. Bajakian offered commentary on several of the other imaging studies that occurred in 2020, and he largely deemed them consistent with TM over infarct. A cervical MRI performed in February 2020, for example, revealed more increased signal

in the posterior cord, not the anterior section (as again Dr. Bajakian seemed to believe would be evidenced in an infarction). Tr. at 179–81. In addition, the interpreting treater had noted that lesions were likely chronic and attributable to cord volume loss, while also mostly impacting peripheral white matter sections, and hence demyelinating in character—conclusions Dr. Bajakian deemed well founded. *Id.* at 181–82; Ex. 13 at 1218.

MRIs of Petitioner's cervical and thoracic spine performed in March 2020 noted no new or expanded cord signal abnormalities, along with resolution of prior enhancement. Ex. 13 at 855–56, Tr. at 182–83. Dr. Bajakian felt this was consistent with an inflammation-driven process, which could be partially arrested over time—as opposed to an infarct, which if enhancing would be more limited on MRI and not likely to regress. Tr. at 183, 184 ("[s]o a spinal cord infarct is a fixed lesion, right? Once it dies, there's no coming back from that"). The imaging from this point in Petitioner's medical history (now three months post-onset) suggested to Dr. Bajakian that treatments Petitioner was receiving had helped a bit (if not clinically). *Id.* at 184. (Dr. Bajakian admitted on cross, however, that an infarct would also *not* likely result in enhancement three months after onset. Tr. at 198–99). Dr. Bajakian reached similar conclusions with respect to August 2020 imaging. *Id.* at 184–87.

C.      *Respondent's Experts*

1.      <u>William Zucconi, D.O</u>. – Dr. Zucconi is a neuroradiologic expert, like Dr. Bajakian, and he offered a written report and testimony for Respondent. Report, dated June 27, 2023, filed as Ex. E (ECF No. 41-1) ("Zucconi Rep."), Dr. Zucconi opined that Petitioner had likely experienced "a catastrophic spinal cord injury" more consistent with infarct than TM. Tr. at 220.

Dr. Zucconi attended State University of New York ("SUNY") at Geneseo for his undergraduate and graduate degrees. Curriculum Vitae, filed as Ex. F (ECF No. 41-8) ("Zucconi CV") at 1; Tr. at 215. He then attended the New York College of Osteopathic Medicine, where he also completed a one-year integrated anatomy fellowship. Zucconi CV at 2; Tr. at 215. Thereafter, Dr. Zucconi completed an internship at New York Hospital in Queens, followed by residency in Neuroradiology at Stony Brook University Medical Center, Long Island, and a fellowship in Neuroradiology at The Mount Sinai Hospital. *Id.* Currently, Dr. Zucconi is an Associate Professor of Radiology at the Geisel School of Medicine, Dartmouth, as well as a staff neuroradiologist at the Dartmouth Hitchcock Group. Tr. at 216, 217; Zucconi Rep. at 1. Dr. Zucconi is board-certified by the American Board of Radiology with a Certificate of Added Qualification in Neuroradiology. Over the course of his career, Dr. Zucconi has reviewed and consulted on a significant number of cases involving compressive and traumatic myelopathy, spinal cord tumors, spinal cord infarcts, and a diverse array of spinal pathologies. Zucconi Rep. at 1.

21

Setting the stage for his evaluation of the same images discussed by Dr. Bajakian, Dr. Zucconi commented on the practice of imaging in general. Tr. at 224–34. He explained the mechanical process by which an MRI functions, and how it "allows us to create really highly sensitive tissue information imaging." *Id.* at 224. MRIs can obtain different imaging "cuts" of the body, depending upon the plane utilized (axial vs. sagittal). *Id.* at 224–26. For spinal imaging, the focus is on the cord and canal within the bone vertebrae. *Id.* at 226. Gray matter tissue is found in the center of the cord, with white matter surrounding it. *Id.* at 226–27.

MRI processes can yield different kinds of images depending on the specific technique used. TS-weighted images, Dr. Zucconi noted, are "sensitive to the presence of water." Tr. at 229. They thus reveal the presence of "swelling or abnormal tissue content." *Id.* T2-weighted images would cause cerebrospinal fluid in the cord to appear bright—and "many, many pathologies show abnormal tissue water content" that can reflect the presence of an infarct, tumor, edema/swelling (sometimes attributable to vertebral compression), or infectious/inflammatory process. Tr. at 229, 230. The kind of imaging "slice" obtained could also establish the location in the cord of the damage. *Id.* at 231.

In addition, contrast (a gadolinium agent) can be injected into the body when an MRI is to be performed, and it can be seen on imaging "in the vessels or in the tissue," helping with diagnoses. Tr. at 231–32. The contrasting agent can pass the blood-brain barrier (the breach of which demonstrates the presence of cord harm/inflammation) and "seep out into the tissue," subsequently showing up in imaging and revealing the presence of an active inflammatory process. *Id.* at 231. Dr. Zucconi also mentioned another imaging technique—"short tau inversion recovery," or "STIR." *Id.* at 234. STIR involves a "T2-weighted sequence" that increases the light-dark contrast, in order to create a highly-sensitive image that helps identify "subtle cord pathology." *Id.* at 235.

Dr. Zucconi preliminarily discussed the competing diagnoses and how they would usually be confirmed via imaging. Tr. at 220–21, 232–34. TM, he contended, is "an inflammatory condition of the spinal cord," and its most "common presentation" on imaging is "enhancement in T2 signal." *Id.* at 221. Dr. Zucconi noted in particular that usually the radiologic evidence of inflammation will be evident "when patients present," and thus at the time they are experiencing acute clinical symptoms. *Id.* Infarcts can have different causes, but an ischemic spinal cord infarct specifically involves "deprivation of blood flow," thus depriving the CNS of oxygen and resulting in tissue death. *Id.* Infarcts can affect a portion of the cord (often the anterior, or front) but can also have "holocord" impact—although even then, some sparing of the CNS tissue can still occur. *Id.* at 227.

Imaging can corroborate the existence of an infarct, albeit in a way somewhat differently from what establishes TM. This confirmation cannot often be obtained during an infarct's acute

stage, however, "because the onset [of symptoms] is so dramatic from a clinical standpoint"—and thus there will be "very little, if any, findings within the first several hours," with a subsequent "relatively predictable course of events," characterized by evidence of "signal abnormalities, subsequent cord swelling, and then enhancement." Tr. at 220, 221. Often, the enhancement of an infarct will reveal somewhat more localized signal in specific parts of the cord, however. *Id.* at 232. In particular, the gray matter sections of the cord are more likely to be impacted. *Id.* at 233 (imaging will reveal patterns that establish "various degrees of selective insult to that sensitive tissue within the cord"). Enhancement is not usually evident early on with an infarct, "because the injury has not evolved" to the point where blood-brain barrier breakdown occurs (necessary for the contrast agent to flow into the cord and then be observed). *Id.* at 245.

Dr. Zucconi then went on to provide commentary on the same imaging progression discussed by Dr. Bajakian, as follows:

(a)    First December 8, 2019 Images – Dr. Zucconi noted that Petitioner had arrived at the hospital emergency department in the early afternoon of December 8th. Tr. at 222. She had initially complained of back pain while at home, beginning around lunch time, which later progressed so rapidly to "flaccid quadriplegia" that she became unable to "move her extremities at all" (although she had been able to walk into the hospital two or so hours earlier). *Id.* at 222, 223. Thus, Petitioner was already in the midst of an obviously severe and progressive disease process when this initial imaging was performed.

The first images were obtained mid-afternoon (around 3 pm), and after Petitioner had appeared at the ED. *See generally* Ex. 5 at 15–17. In Dr. Zucconi's reading, the cervical spine imaging revealed evidence of subtle (meaning difficult to see) hyperintensity/abnormal signal on the cord front/anterior (and thus he agreed with Dr. Bajakian that initial findings were not normal—contrary to what the contemporaneous treaters who performed these MRIs had indicated). Tr. at 235, 237–38.[15] Dr. Zucconi denied that this imaging showed any cord swelling, however, and he referenced top to bottom aspects of the imaging that in his view established expected/natural variance in cord width. Tr. at 235–37. The initial imaging results were, he opined, supportive of infarct in an important regard: the "largest area of gray matter, that [is] most sensitive to ischemia" was the locus of the abnormality (although he admitted that the evidence for this was quite subtle). *Id.* at 238, 241. Imaging could nevertheless reveal these kind of findings around the time of an especially-acute infarct, as was experienced here. *Id.* at 241–42.

---

[15] Dr. Zucconi speculated that this set of images may have been erroneously deemed normal because they were obtained on a Sunday afternoon, when he proposed a radiology department might be "short-staffed"—although this is an uncorroborated contention (and in any event both radiologic experts agreed these images did reveal abnormalities). Tr. at 239.

(b)    Second December 8, 2019 Images – Some images from this next set (obtained in the evening of December 8th) reflected application of the "flair sequence" technique—an MRI sequence that suppresses signal from free water in the CSF, while keeping white matter pathology (lesions) bright)[16] to provide a means of increasing "conspicuity" of lesions. Tr. at 243. Treaters also at this time employed the DWI technique, which in Dr. Zucconi's view had "the greatest degree of utility" to identify a suspected infarction; DWI would help yield images reflecting that "water molecules are trapped in dying and dead cells," consistent with CNS tissue deprived of blood, which an infarct would cause. *Id.* at 244, 246.

The results from this MRI round, Dr. Zucconi maintained, further supported infarct over TM. Tr. at 244–50. The relevant images again revealed subtle abnormalities in the gray matter/cord central section, with some "pencil like hyperintensity" evident in the anterior portion of the cord. *Id.* at 245; Zucconi Rep. at 4. In addition, the DWI imaging did not reveal the kind of "diffusion restriction" that a demyelinating cord lesion attributable to inflammation would feature, but instead yielded a selective pattern (primarily impacting the gray matter) more consistent with infarct. Tr. at 246. Enhancement was otherwise missing (although contrast had been used in this second round of imaging). *Id.*

Dr. Zucconi disputed Dr. Bajakian's contention that there was a problem with the reliability of this set of DWI images. Tr. at 246. He agreed that the image in question was "noisy" and difficult to interpret, but deemed it a positive (favoring infarction) scan "based on what we know about the T2 information and the pattern of signal in this." *Id.* at 247.

(c)    December 10, 2019 Images – These images (obtained two days after Petitioner's emergency hospitalization) revealed, in Dr. Zucconi's reading, "bright T2 signal within the central aspect of the spinal cord," and thus (again) within the gray matter. Tr. at 248. He observed no enhancement, however (consistent with the fact that it would take time for an infarct to begin to damage cord tissue sufficiently for contrast to leak into the spine and "show up" in imaging), and thus contested Dr. Bajakian's argument that there was by this point evidence of scattered enhancement. *Id.* at 248, 249, 273–74; Zucconi Rep. at 5. Only when the damage due to the initial infarct was extensive enough to result in *secondary* inflammation, he contended, would enhancement be observable on imaging (as the ongoing inflammation would result in subsequent blood-brain barrier weakening). *Id.* at 249 ("[a]s part of that infarct, you have dying tissue and what happens is the blood vessels open up and they allow contrast to leak. Their tight, porous, nonporous boundaries allow the contrast into the tissue").

---

[16] "Fluid-attenuated inversion recovery (FLAIR)" is "a magnetic resonance imaging (MRI) sequence that produces strong T2 weighting, suppresses the CSF signal, and minimizes contrast between gray matter and white matter" which "produces images with significantly increased lesion-to-background CSF contrast and enhances the visibility of lesions as well as their detectability, particularly in the peripheral subcortical and periventricular regions." National Library of Medicine, https://pubmed.ncbi.nlm.nih.gov/9402679/ (last visited May 8, 2026).

Dr. Zucconi disputed other aspects of Dr. Bajakian's interpretation of these images. Dr. Zucconi did observe evidence of cord "sparing" (parts of the cord not impacted by tissue harm), even if the damage from the infarct was now progressing throughout the cord. Tr. at 249. This was consistent with the nature of infarct, but less so with TM, which he maintained would result in imaging evidence of a "process more advanced at [clinical] presentation." *Id.* at 250.

(d)    December 18, 2019 Images – Dr. Zucconi further commented on the cervical and thoracic images obtained ten days after Petitioner's initial acute symptoms and hospitalization (now well into the "subacute" phase of the infarct's development). He noted a T2-weighted sequence had been run at this time, due likely to the sensitivity of this imaging technique, and thus its capacity to reveal "the presence of hemorrhage." Tr. at 250. These images in his opinion showed the dramatic degree of cord injury progression and confirmed (as evidenced by a dark spot) an area of hemorrhage common to an ischemic infarction in its later stages. *Id.* at 251; M. Lee et al., *Diagnostic Approach to Intrinsic Abnormality of Spinal Cord Infarct,* 39 Radiographics J. 6:1824 (2019), filed as Ex. 50 (ECF No. 30-7) ("Lee"), at 1830 (noting that "hemorrhagic conversion" could be seen on MRI as infarct progressed). Dr. Zucconi did not agree with Dr. Bajakian's reading of these images that a possible hemorrhage was simply a "flow-related artifact." Tr. at 251. He also assessed the images from this time as revealing excessive cord swelling ("it's occupying essentially the entire area of the spinal canal"); "in the absence of an underling hypervascular lesion," flow was not likely. *Id.* at 251, 252.

Dr. Zucconi also opined that certain of the images from this MRI sequence did not reveal enhancement or restricted diffusion correlating to the initial areas of signal abnormality from the earlier imaging obtained on December 8th and 10th. Zucconi Rep. at 5, 7. Instead, they established the progression of cord swelling and edema, all the way up the cord into the brainstem. *Id.* at 252. Severe infarcts, he stated, could progress in this manner. *Id.* at 252–53. Dr. Zucconi acknowledged that enhancement could now also be detected somewhat in later images, but deemed it the product of an earlier "underlying insult" significant enough to cause tissue injury across the cord over the course of ten days. *Id.* at 253; Zucconi Rep. at 5. In TM, by contrast, such results would not be seen so long after initial clinical presentation. Tr. at 253–54.

In addition, the thoracic cord MRI imaging from December 18th revealed "clear confinement of signal abnormality to the central gray area." Zucconi Rep. at 7 (Figure 5); Tr. at 254. This kind of selective process was more consistent with infarct than TM, since the gray matter was particularly "sensitive to ischemia." Tr. at 255. And in fact, treaters who performed, and then assessed the results of, this MRI agreed that it favored infarct as the proper diagnosis. *Id.* at 256 (referencing Ex. 5 at 1503). (At the same time, however, Dr. Zucconi conceded that this imaging

25

suggested an alternative explanation—"[a] vascular or inflammatory myelopathy that did not ultimately cause myelomalacia"[17]—inconsistent with infarct. Zucconi Rep. at 7; Tr. at 274).

(e)    Other Imaging – Dr. Zucconi's testimony also included discussion of later imaging evidence bearing on the parties' diagnostic disputes. A spinal angiogram (employed to look for potential vascular malformations/occlusions)[18] was performed on December 19, 2019, and it yielded negative results that could have offered an explanation for the possible infarct Petitioner experienced. Tr. at 256–57. Dr. Zucconi maintained, however, that this angiogram procedure is not used for treatment of existing ischemia, but instead is aimed at resolving potential future harms. *Id.* at 257. The angiogram would not be able to identify the cause of a prior ischemia (such as an embolism). *Id.* In his view, the results of this testing only established "that her infarction was not secondary to an acute venous congestive phenomenon due to an underlying vascular abnormality." *Id.* at 258.

The final imaging Dr. Zucconi commented on was from an MRI performed months later, in August 2020. Zucconi Rep. at 8 (Figure 6). This set of images certainly, he admitted, would be seen in "any form of severe spinal cord insult" months after onset. Tr. at 259. But Dr. Zucconi also maintained these later images revealed overall cord atrophy, with volume loss that "reinforces the severity of the tissue damage," but with some other evidence of "residual signal abnormality" in the central part of the cord. Tr. at 259. Dr. Zucconi particularly highlighted the latter, deeming it consistent with "cases of chronic spinal cord infarction," and known as "[c]entral cystic myelomalacia." *Id.* Thus, this final set of images corroborated the infarct diagnosis overall.

To give some substantiation for his reading of the previously-discussed imaging, Dr. Zucconi referenced several items of literature. Zalewski, for example, considered a sample of 126 individuals with spinal cord infarctions, and noted a number of sub-findings from MRIs performed on those studied patients that were consistent with what he saw from the imaging in Petitioner's medical record. Zalewski at 59 (Table 2). Here, Dr. Zucconi maintained, there was evidence of diffusion restriction as early as December 8th, along with gray matter involvement, and thin/linear enhancement on "arterial territory," plus subtle but present early abnormal signal. Tr. at 260. And (as Zalewski noted) the presence of "atypical" features on imaging (such as evidence of issues outside the anterior territory of the cord) did not rule out an infarct, since it was common to misdiagnose infarct as TM. *Id.* at 265–66; Zalewski at 61.

---

[17] "Myelomalacia" is defined as the "morbid softening of the spinal cord." *Myelomalacia*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32720&searchterm=myelomalacia (last visited May 8, 2026).

[18] "Vascular Malformation" is defined as "an abnormal vascular formation resulting from a developmental anomaly rather than from neoplastic growth; common types include arteriovenous fistulas, some types of hemangiomas and lymphangiomas, nevus anemicus, and nevus flammeus." *Vascular Malformation*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=87817&searchterm=vascular+malformation (last visited May 8, 2026).

An item of literature also offered imaging comparable to what Petitioner's MRIs revealed—"selective" harm to the gray matter/cord anterior, with abnormal signal in that section and correlated enhancement. *See generally* M. Vargas et al., *Spinal Cord Ischemia: Practical Imaging Tips, Pearls, and Pitfalls,* 36 Am. J. Neuroradiol. 825 (2015), filed as Ex. 54 (ECF No. 30-10) ("Vargas"), at 829 Fig. 6 (image of ischemia during subacute/later phase). Another article confirmed that imaging of a progressing infarct, relying on techniques with specific utility in the context of infarct, like DWI, could reveal signal abnormalities very early on ("within hours of onset")—as evidenced here by the December 8th imaging—even though initial imaging could be often inconclusive. Tr. at 262; N. Yadav et al., *Spinal Cord Infarction: Clinical and Radiological Features,* 27 J. Stroke & Cerebrovasc. Dis. 10:2810 (2018), filed as Ex. E-3 (ECF No. 41-4) ("Yadav"), at 2810, 2817 (although "conventional MRI may be normal in some patients especially in the acute stage" of clinical symptoms, use of DWI technique could corroborate infarct within minutes to hours of onset).

Dr. Zucconi did briefly propose some potential explanations for Petitioner's infarct (although as discussed below, the medical record ultimately does not permit a conclusion as to a likely cause). One article—a case series involving two patients—discussed how a fibrocartilaginous embolism[19] could look initially like TM, but that this kind of infarct trigger was a common cause of infarcts in younger patients not otherwise possessing the risk factors commonly associated with infarct. Tr. at 265; M. AbdelRazek et al., *Case Series of Two Patients with Fibrocartilaginous Embolism Mimicking Transverse Myelitis of the Spinal Cord,* 40 J. Clin. Neurosci. 66 (2017), filed as Ex. E-6 (ECF No. 41-7). He noted, however, that spinal cord infarcts could be properly diagnosed even in the absence of evidence of such possible explanations. Tr. at 271. On cross-examination, Dr. Zucconi admitted that fibrocartilaginous infarcts were rare, and that none of Petitioner's treaters proposed one had occurred in Petitioner's own case. *Id.* at 272–73.

Overall, Dr. Zucconi maintained that the diagnostic criteria for infarct were met in this case, based on both imaging and Petitioner's clinical history, and he followed Zalewski's diagnostic criteria to explain why. Tr. at 266–69; Zalewski at 60 ("Box. Proposed Spinal Cord Infarction (SCI) Diagnostic Criteria"); *see also* Tr. at 270. First, her nadir occurred within twelve hours of onset, and with no evidence close in time to some immediate traumatic incident. Tr. at 267. The tempo of Petitioner's injury progression was especially important, as underscored in items of literature like Vargas. *Id.* at 268–69; Vargas at 825 ("[a]s with cerebral infarction, the onset of spinal cord infarction is typically abrupt. Most patients develop symptoms quickly, with a maximal symptomatology reached within 12 hours for 50% of patients and within 72 hours for most patients").

---

[19] A fibrocartilaginous embolism, Dr. Zucconi maintained, would occur "when a small amount of the internal disc material herniates out of the disc and gains access to the adjacent arterial system of the cord and it ends up blocking one of the arteries that goes directly to the spinal cord." Tr. at 264.

Second, the MRIs revealed no evidence of a likely disc compression explanation for Petitioner's cord injury, T2-hyperintense signal, and DWI positive findings (although they were stronger by December 18th). Tr. at 267. The progression that imaging revealed over the first ten days of Petitioner's illness, coupled with the hyperacute clinical onset, was especially consistent with infarct in Dr. Zucconi's view. *Id.* at 270 And (in Dr. Zucconi's opinion—thus despite the competing TM diagnosis) no other explanation existed as more likely. *Id.* at 268. (Dr. Zucconi deferred to Dr. Price, Respondent's neurologic treatment/diagnosis expert, as to whether CSF lab testing results supported infarct).

2.    Dr. Raymond Price – Dr. Price is a neurologist, and he opined in Respondent's favor on the issue of diagnosis. Report, dated July 11, 2022, filed as Ex. A (ECF No. 22-1) ("First Price Rep."); Report, dated July 24, 2023, filed as Ex. G (ECF No. 43-1).

Dr. Price attended the University of North Caroline-Chapel Hill for his undergraduate degree, and the University of Pennsylvania for his medical degree. Curriculum Vitae, filed as Ex. B (ECF No. 22-4) ("Price CV") at 1; Tr. at 317–18. He then completed his internship in Internal Medicine and residency in Neurology at the Hospital of the University of Pennsylvania. Price CV at 1; Tr. at 318. Thereafter, he pursued a fellowship in Clinical Neurophysiology with a Neuromuscular focus at the same institution. *Id.* Currently, Dr. Price is an Associate Professor of Clinical Neurology, as well as the Neurology Residency Director and Neurohospitalist Division Co-Director in the Department of Neurology at the University of Pennsylvania. Price CV at 1; Tr. at 318–19. He is board certified by the American Board of Psychiatry and Neurology in Neurology with added qualification in Neuromuscular medicine. Price CV at 2; Tr. at 318. He estimates that he has personally cared for hundreds of patients with myelopathies, including spinal cord infarction, longitudinally extensive transverse myelitis, multiple sclerosis, and other inflammatory diseases affecting the spinal cord. First Price Rep. at 1. Dr. Price did, however, acknowledge that he does not have any specific training in neuroimmunology or that he specializes in neuroimmune disorders. Tr. at 392.

Dr. Price offered his views on the general indicia for the competing diagnoses in this matter. Infarcts, he contended, reflect circumstances where "tissue does not get enough blood supply, and as a result, the tissue will die." Tr. at 322. Spinal cord infarcts can be the result of ischemia, direct trauma to the cord (an accident, or sometimes in the context of a surgery), an aneurysm, or some other unidentified spontaneous factor. *Id.* at 322–23. Cord infarcts often present very acutely—hours to a day or two—with clinical evidence of unilateral or bilateral dysfunction, including sensory issues below the spinal level of the infarct, while sparing function above it. *Id.* at 323-24.

To diagnose an infarct, treaters take into account (a) the sudden nature of onset of symptoms, (b) clinical evidence of myelopathy (meaning the nature of the symptoms), and (c)

28

corroborative evidence, like MRI results. Tr. at 325. Proof of vertebral body etiology is helpful, but such explanatory factors are not seen in more than a third of infarcts. *Id.* And proof of inflammation (as would be indirectly provided by CSF testing) can help qualify whether in fact an infarct is likely occurring. *Id.*

Dr. Price also reviewed the features and diagnostic criteria for TM. He defined TM generally to be spinal cord injury attributable to inflammation, adding that the term "TM" constituted a "grab bag" for many possible disease processes or causes (in some cases, for example, MS or other CNS-impacting injuries can initially present with what looks like a single occurrence of TM), or can be due to a prior infection. Tr. at 325–26. TM's cause often cannot be identified, leading treaters to deem it idiopathic in origin. *Id.* at 326. TM features symptoms comparable to an infarct—"the symptoms are typically going to be a sensory level, a motor deficit, a sensory deficit." *Id.* at 327.

The speed of onset of clinical symptoms, Dr. Price maintained, was highly significant in differentiating TM from an infarct. Tr. at 394. He noted that, from a clinical standpoint, onset to nadir within four hours was generally agreed to be evidence favoring infarct, whereas a progression to nadir that took two or three weeks would very likely not be consistent with infarct. Tr. at 327. Dr. Price allowed that a timeframe of more than four hours to up to 24 or 48 hours placed diagnosis into a "gray zone," but emphasized that in such a case the totality of evidence was critical in evaluating what diagnosis better fit the circumstances. *Id.* at 328.

Dr. Price next reviewed the Petitioner's medical history—both contemporaneous treatment evidence as well as later histories provided in subsequent treatment obtained in 2020. Although he conceded overall that the record contained "a lot of diagnostic uncertainty" as to the nature of Petitioner's injury, he ultimately favored infarct. Tr. at 374, 375.

Particularly important to Dr. Price was the overall short timeframe from onset to nadir. An initial treatment note from around 1:00 pm on December 8, 2019, noted that Petitioner's onset of back pain and arm weakness began earlier that day, after she had left the gym. Tr. at 331–33; Ex. 5 at 19. Tightness in her back from the prior day was reported but deemed by Petitioner to be something she often experienced, and distinguishable from what occurred on the 8th. Tr. at 333. And there was otherwise no evidence from the days or weeks prior of Petitioner having experienced any neurological deficits. *Id.* at 334.

Later records from December 8th confirmed this fast timeline. Tr. at 335–39. In January 2020, it was noted that Petitioner had previously experienced general "tightness" in her shoulders, but that she did not view this as pain. Tr. at 328 (referencing Ex. 1 at 63). But Petitioner recalled that the morning of December 8, 2019, she had worked out, and then at home while showering began to experience sudden intense pain in her back, followed by right-arm numbness and

29

weakness within ten minutes. *Id.* at 329. A friend transported her to the emergency department, and although she had been able to walk in unassisted, she could no longer move her legs within 30 to 60 minutes. *Id.* And her clinical symptoms encouraged treaters to perform an MRI (although it had been interpreted as normal—something both radiologic experts disputed). *Id.* at 339.

Dr. Price deemed this to be evidence of how rapid Petitioner's progression to nadir had been. Tr. at 330 ("she is basically at her nadir from a motor and sensory function, or at least from a motor function, . . . within 40 to 60 minutes of symptoms onset, which would put us in the . . . the more clearly defined spinal cord infarction category"). By 5:30 pm, Petitioner's "motor deficits are maximal and as severe as you could possibly imagine." *Id.* at 340. The same extremely rapid disease progression was evidenced by other documents from treatment events in 2020. *See generally Id.* at 330–31. Dr. Price thus concluded the temporal period from onset to nadir was four to five hours total. *Id.* at 343-44. By the afternoon of December 8th, Petitioner's symptoms overall reflected an infarct impacting the total cord, anterior and posterior. *Id.* at 401–02.

This rapid temporal progression was, Dr. Price reasoned, consistent with literature addressing features of infarcts. Tr. at 334. Zalewski proposed that a timeframe from onset to nadir of less than 12 hours was consistent with infarct. Zalewski at 58 Table 1. And evidence of "severe motor loss," as here, plus objective sensory loss, was strong proof of nadir. Tr. at 334, 336. Other literature similarly differentiated from a progression to nadir in less than six hours (supporting infarct) versus more than 72 hours in TM, if not longer. *Id.* at 375–76; Park at 3 (study contrasted timeframe to nadir in sample of 14 infarct patients (with 9 experiencing nadir in less than six hours) versus TM group of 15 patients (13 of whose timeframes to nadir took more than 72 hours)).

Dr. Price disputed that Petitioner's nadir occurred on December 10th, as contended by Dr. Pachner. At the time of Petitioner's arrival at the ED on the afternoon of December 8, 2019, her breathing rate was notably elevated. Tr. at 335; Ex. 5 at 21. By later that same day, Petitioner's voice was weak, and "that would be expected if she's having trouble moving air through her vocal cords" due to neurologic injury. Tr. at 339. Other evidence of shortness of breath or difficulty swallowing, however, was more equivocal. *Id.* at 340–41. But Dr. Price nevertheless opined that as of the 8th, Petitioner's "respiratory status is incredibly tenuous . . . and very concerning," and at this stage "she's in clear respiratory distress heading towards intubation and likely should be intubated very soon." *Id.* at 341. The record did not suggest this particular symptom worsened thereafter, moreover. *Id.* at 342. And treaters took note of the matter (suggesting it was evident to them as an existing problem, as opposed to something that worsened later). *Id.* at 350.

Dr. Price admitted that treaters did not act to test Petitioner's respiratory function on December 8th, but he speculated this was because imaging was given priority. Tr. at 350. Respiratory monitoring and maintenance occurred later—and Dr. Price allowed that it evidenced "severe respiratory compromise." *Id.* at 351, 352 (Petitioner displayed "less than 10 percent of

normal on the vital capacity"). But Dr. Price felt intubation could have been performed earlier than December 10th, given Petitioner's condition, and that it was possible the initial MRI imaging (interpreted as normal) gave treaters a false complacency. *Id.* at 352–53, 355, 357. Dr. Price acknowledged that the level of cervical involvement was consistent with respiratory issues. *Id.* at 354. Ultimately, however, Dr. Price viewed the treatment decision to intubate on December 10th to be a function of prior treatment decisions and assessments about what was necessary. *Id.* at 356–57, 358 ("I think her respiratory status is poor and she just kind of tires out [later]"). He therefore did not consider more intrusive treatment of respiratory issues by December 10th to undermine his conclusion that nadir was reached "at a maximum of five-ish hours, maybe even four hours," with the respiratory dysfunction already having occurred in that same timeframe as her other, more clinically-immediate symptoms of quadriplegia. *Id.* at 360.

Other treatment decisions suggested to Dr. Price that an infarct was more likely the "best" diagnosis. For example, a repeat MRI was performed the evening of December 8th—this time with DWI "to rule out cervical cord ischemia." Tr. at 345. One initial treater had considered the issue of Petitioner's "mean arterial pressure—another consideration relevant to infarct. *Id.* at 350, 355 (evidence treater ordered others to "keep her mean arterial pressure up"); Ex. 5 at 2737 (states "CV [cardiovascular]: MAP goal > 80 for spinal cord perfusion.").

Dr. Price acknowledged that a factor often thought to *disfavor* infarction—evidence that sensation to vibration had been "lost on examination"—was also present, since there was none of the sparing of regions of the cord often thought to be characteristic of an infarct. But he maintained that this finding still allowed for an infarct—and that it was a diagnostic oversimplification to assume infarcts always involve sparing. Tr. at 345–46. The "classical teaching" about which arteries service the anterior portion of the cord (often associated with infarcts, though not exclusively) simplifies the distinction between posterior and anterior cord impacts—such that clinical evidence of vibration sensitivity sparing is viewed to support the diagnosis of infarct (which will often impact only the anterior portion of the cord—and hence involve anterior arteries, with unaffected arteries still supplying blood to other parts of the cord). *Id.* at 346. But literature like Zalewski gave more weight, diagnostically, to evidence of selective sparing of pain or temperature loss sensation (with loss of vibration sensation actually common in the sample considered in that study). Zalewski at 58 Table 1 (95 percent of 133 patient sample revealed sensory loss of some kind, and Zalewski only included a subcategory for "selective pain/temperature loss" as opposed to vibration sensitivity). Thus, infarcts did not unerringly "follow an anterior posterior gradient," and the presence or absence of vibration sensitivity was not necessarily determinative of an infarct.[20] Tr. at 349.

---

[20] At trial, Petitioner's counsel objected to this line of testimony, on the grounds that it constituted an "undisclosed" opinion not formally memorialized in Dr. Price's expert report. Tr. at 347–48. However, Dr. Pachner unquestionably had already addressed in his direct testimony the evidence pertaining to sparing of vibration sense, and the significance of that to the argument that the anterior cord impact was so limited and/or revealed any neurologic function "sparing." *See generally* Tr. at 74–76. This topic was also glancingly referenced in Dr. Pachner's first report. First Pachner Rep.

Another factor bearing on the proper diagnosis was the CSF testing Petitioner underwent. Dr. Price noted that the first such testing (performed December 8th) revealed a completely normal white blood cell count (one out of a normal range of zero to ten). Tr. at 360. Although Dr. Price allowed evidence of pleocytosis was not always seen in TM (and therefore its absence was not exclusionary for the diagnosis), these results pointed against an inflammatory process underway (and meant Petitioner's very rapid progression to nadir deserved even more diagnostic weight). *Id.* at 361. The next CSF testing was performed ten days later (December 18th), and now eleven white blood cells were revealed—exceeding (if slightly) the same normal range used by the treating hospital. Dr. Price admitted that the normal range defined by the hospital that tested Petitioner's CSF—zero to ten white blood cells—was broader than the range he used in his practice (thus implying the presence of the eleven white blood cells was in fact elevated). Tr. at 402. But even the level Petitioner demonstrated was not, in his view, particularly alarming; "given her quadriplegia," Dr. Price might have expected to see "30, 50, . . . 100, any of those," had the clinical symptoms been the product of an ongoing inflammatory process. *Id.* at 403. Bacterial meningitis would, for example, potentially result in white blood cells counts in the thousands, and even a viral form would range up to 40 to 80 white blood cells.

Accordingly, Dr. Price did not deem this second CSF testing result to reflect "a prominent pleocytosis," and he added that it could be nonspecific in any event. Tr. at 362, 363–64, 403–04 ("given her degree of [clinical] severity, this is very minimally elevated"). He noted that a study looking at an "impairment scale" used in medicine to evaluate cases of acute TM showed that patients with motor involvement far less debilitating than what Petitioner had experienced displayed moderate levels of pleocytosis *comparable* to what Petitioner experienced. *Id.* at 380-81; J. Sellner et al., *Diagnostic Workup of Patients with Acute Transverse Myelitis: Spectrum of Clinical Presentation, Neuroimaging, and Laboratory Findings,* 47 Spinal Cord J. 312 (2009), filed as Ex. 164 (ECF No. 75-5) ("Sellner"), at 314 (of 59 patients suffering from the mildest level of impairment due to acute TM, 49 percent had pleocytosis, but with a mean white blood cell count of nine cells). Thus, the level of pleocytosis revealed by Petitioner's second round of CSF testing was not at all equivalent to the degree of clinical harm she had actually experienced, undermining the conclusion that it was evidence of an inflammatory-driven process.

In addition (and independent of the white blood cell count), CSF testing also revealed a negative IgG index—inconsistent with the positive index "seen in 70 to 90 percent of patients with [TM]," and hence corroborating the lack overall of evidence of inflammation in the spinal cord. Tr. at 374, 376–78, 381; Sellner at 314 (82 percent of a sample of 621 patients displayed abnormal IgG indices). Dr. Price deemed proof of inflammation within the spinal cord corroborating to onset of clinical symptoms to be highly important in confirming a TM diagnosis (and he thus disagreed

---

at 8. It was accordingly a reasonable subject for Dr. Price to discuss (as a witness for Respondent, called to rebut Petitioner's case), even if not literally set down in his own report—and I note as well that Dr. Pachner returned to this same topic during the Petitioner's closing rebuttal case. *See* Tr. at 465. I thus do not deem Dr. Price's mention of this issue to have been prejudicial to Petitioner, who was provided ample opportunity at trial to respond.

with Dr. Pachner's suggestion that it was irrelevant or "too strict" to link the two early on in the clinical course of injury). Tr. at 385.

Consistent with Dr. Zucconi, Dr. Price read the sequential MRI results to better support infarct than TM. He accepted the initial MRI revealed no degenerative explanations for Petitioner's alarming symptoms. Tr. at 364. But he emphasized the view of both radiologic experts that (contrary to what contemporaneous treaters proposed) there were "a lot of subtle abnormalities" in these first images. *Id.* at 365. Given Petitioner's progressive and declining clinical presentation so soon after onset, there was a "gigantic clinical radiologic dissociation" that "argue[d] heavily" for infarct. *Id.* at 366. And, Dr. Price opined, contemporaneous treaters seemed eventually to lean in that direction, since they proposed DWI imaging at this early stage of Petitioner's treatment. *Id.* at 366 ("you request DWI imaging when you are worried about spinal cord infarction"), 367. That imaging also revealed gray matter focus for signal. *Id.* at 367–68.

The next imaging from December 10th only underscored why infarct was the more proper diagnosis, Dr. Price maintained (although he was careful to note that the imaging "nuances" testified to by the radiologic experts were matters beyond his personal expertise). In the two days from the time of Petitioner's emergency department visit, there was already evidence of edema, which was reported in infarct (although Dr. Price admitted it was not typical). Tr. at 369. Dr. Price accepted Dr. Zucconi's contention that this imaging did not reveal enhancement[21]—but regardless, the "big picture" for Petitioner, clinically speaking, was her sudden quadriplegia. *Id.* at 370. Then, DWI was utilized again on the 18th of December (further confirming the suspicion of infarct), and in Dr. Price's (non-specialist) view the results more reflected infarct. *Id.* at 371. Dr. Price did not give the spinal angiogram weight as a diagnostic tool that in this case could help determine diagnosis. *Id.* at 372.

Dr. Bennett (who treated Petitioner months after her initial presentation) had opined that Petitioner's TM was vaccine-caused, but Dr. Price questioned the evidentiary support for this opinion. For example, Dr. Price observed that one article specific to TM and vaccines identified only two case report instances of a flu vaccine-TM association, and even then manifesting only within two weeks of vaccination—not a month as here. Tr. at 382–83; N. Agmon-Levin et al., *Transverse Myelitis and Vaccines: A Multi-Analysis,* 18 Lupus J. 1198 (2009), filed as Ex. 23 (ECF No. 17-8), at 1200 Table 1. Another epidemiologic study found no TM-vaccine association (albeit in the context of evaluating the relationship between vaccination and TM plus ADEM). R. Baxter et al., *Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis,* 63 Clin. Infect. Dis. 1456 (2016), filed as Ex. A-2 (ECF No. 22-3), at 1460–61.

---

[21] On cross examination, however, Dr. Price allowed that evidence of enhancement on imaging within a week of onset would be a factor in support of a TM diagnosis. Tr. at 395–96.

33

Dr. Price also denied the importance of the length of a spinal cord lesion, measured as vertebral segments, as having diagnostic significance in differentiating between an infarct and TM. Tr. at 386–87. In support, he noted Zalewski had identified infarcts with significant lesion lengths. *Id.* at 387; Zalewski at 59 Table 2, 62. He also stressed how common it was for an infarct to be misdiagnosed as TM. Tr. at 387–88; N. Zalewski et al., *Evaluation of Idiopathic Transverse Myelitis Revealing Specific Myelopathy Diagnoses,* 90 Neurol. E96 (2018), filed as Ex. E-4 (ECF No. 41-5) ("Zalewski II"), at e97 (""[i]n our clinical experience, ITM is often proposed as a specific diagnosis for patients who do not meet the diagnostic criteria"), e100 (emphasizing the need to better distinguish true TM from "noninflammatory myelopathies" like infarct, in order to avoid unnecessary therapies).

On cross examination, Dr. Price noted that it was not his conclusion that Petitioner's injury could only be diagnosed as an "anterior" spinal artery ("ASA") infarct. Tr. at 397–98. He did not see evidence of a "classic anatomic, vascular, . . . organization that falls nicely into those categories," suggesting that dividing up infarcts into ASA and non-ASA amounted to an "artificial dichotomy." *Id.* at 398. It was in fact a "gross oversimplification" to view infarcts this way, as clinical results considered in articles like Zalewski established. Tr. at 399. In this case, Dr. Price proposed that the damage from Petitioner's infarct was more global, implicating both the anterior and posterior portions of the cord. *Id.* He emphasized that his opinion on diagnosis relied on a review of the totality of evidence in this case, comparing that to articles discussing different infarct features. *Id.* at 400.

### D.    Treater Opinion

Dr. Jeffrey L. Bennett offered two written letter opinions in this case as to Petitioner's proper diagnosis. *See* Report, dated Feb. 24, 2022, as Ex. 16 (ECF No. 17-1) ("First Bennett Rep."); Report, dated Mar. 15, 2022, filed as Ex.39 (ECF No. 21-1) ("Second Bennett Rep.").

Dr. Bennett attended Case Western Reserve University for his undergraduate degree, and Stanford University for his medical and post-doctoral degrees. Curriculum Vitae, filed as Ex. 17 (ECF No. 17-2) ("Bennett CV") at 1. He then completed his internship and a residency in Neurology at the University of Colorado School of Medicine. *Id.* Thereafter he pursued a post-doctoral fellowship at the University of Colorado, Boulder, as well as a Neuro-ophthalmology fellowship in the Department of Neurology at the University of Pennsylvania. *Id.* Currently, Dr. Bennett serves as the Gertrude Gilden Professor for Neurodegenerative Disease Research, is a member of the Graduate Faculty of the Neurosciences Programs, and is involved in the Immunology Graduate Program at the University of Colorado School of Medicine. *Id.* He is board-certified in Neurology by the American Board of Psychiatry and Neurology. *Id.*

34

In his first report, Dr. Bennett summarized Petitioner's relevant medical history, emphasizing the fact that her December 10, 2019 MRI "demonstrated cervical myelitis with extensive cord edema. Her clinical course worsened to tetraplegia, and MRI imaging on December 19, 2019, revealed abnormal signal, gadolinium enhancement, and edema extending from the medulla to T5-6 with predominant central cord involvement." First Bennett Rep. at 1. Dr. Bennett also noted that other possible "autoimmune and infectious causes" had been ruled out; that support existed for a vaccine-caused TM; and that Petitioner's presentation was consistent both with TM diagnostically, and that her actual experiences "fit" with a vaccine causation. *Id.* at 1–2. This report does not, however, mention infarct at all as a possible counter-diagnosis, and almost all of the 21 items of literature filed in association with it deal with infectious causes of TM or the possible causal association between TM and vaccination. *Id.* at 2–3 (citations omitted).

Dr. Bennett's supplemental report is a single-page item summarizing the records filed in this case (discussed in the medical record fact section above) relating to his actual treatment of Petitioner. Second Bennett Rep. at 1. He again notes his opinion that TM is the appropriate diagnosis, although he contrasts it not with infarct but with NMOSD ("Neuromyelitis Optica Spectrum Disorder"). *Id.* He also summarizes the various negative test results for other etiologies for Petitioner's condition, although he includes no discussion of imaging results, or any of the evidence referenced herein by Respondent for a counter-diagnosis. *Id.*

### III.    Procedural History

The matter was initiated approximately five years ago. After the case's activation, Respondent filed his Rule 4(c) Report in January 2022 opposing entitlement. Respondent's Report, filed Jan. 14, 2022 (ECF No. 16). The parties thereafter began the process of filing expert reports, with some delay occurring when current counsel appeared in the matter for Petitioner in late 2022. Expert report filing was completed in the fall of 2024, and the matter set for hearing in 2025. The trial occurred as scheduled in May 2025, and post-trial briefing was concluded in August of that same year. *See* Petitioner's Post-Hearing Brief, dated Aug. 11, 2025 (ECF No. 95) ("Br."); Respondent's Post-Hearing Brief, dated Aug. 11, 2025 (ECF No. 96) ("Opp."). The matter is now ripe for resolution.

### IV.    Applicable Legal Standards

#### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; §

11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[22] There is no Table claim for TM resulting from any covered vaccine (although claims alleging TM as a vaccine injury are quite common in the Vaccine Program).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical

---

[22] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras*, 121 Fed. Cl. at 245 ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (the argument that prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.      *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir.

1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less

39

deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are

employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.     *Consideration of Medical Literature*

Both parties filed a large number of items of medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F.

App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

**ANALYSIS**

**I.        Transverse Myelitis vs. Spinal Cord Infarct**

Although the parties dispute Petitioner's proper diagnosis (as well as how the relevant diagnostic criteria should be interpreted), collectively they have offered reliable evidence illuminating how the competing diagnoses are understood by medical science. TM is a rare kind of myelitis[23] (neuroinflammatory condition) attacking the spine, and is "characterized clinically by acutely or sub-acutely developing symptoms and signs of neurologic dysfunction in motor, sensory, and autonomic nerves and nerve tracts of the spinal cord. Beh at 1–2. Its symptoms can vary, but generally TM can present with a number of different clinical symptoms—weakness, sensory alterations, and often bowel or bladder dysfunction. First Pachner Rep. at 12. TM's etiology is varied, and while it has been associated with various infectious or systemic autoimmune diseases, it can have an idiopathic origin. Beh at 2; A. Borchers & M. Eric Gershwin, *Transverse Myelitis,* 11 Autoimm. Rev. 231 (2012), filed as Ex. 67 (ECF No. 31-6), at 232. "There is often a clearly defined rostral border of sensory dysfunction, and spinal MRI and lumbar puncture often show evidence of acute inflammation." Working Group Criteria at 499.

There is growing support for the view that TM may be overinclusive as a diagnostic classification. C. Goh et al., *MRI in Transverse Myelitis,* 40 J. Magn. Res. Im. 1267 (2014), filed as Ex. E-5 (ECF No. 41-6) ("Goh"), 1268 (deeming TM to constitute a "diagnosis of exclusion," and adding that it is unclear "that there exists a distinct pathogenetic entity of idiopathic transverse myelitis," with the diagnosis incorporating "several underlying entities"). Many neuropathic conditions feature evidence of spinal cord-associated symptoms, and yet TM may not be the ultimately-proper diagnostic descriptor for the actual disease at hand. For example, spinal cord inflammation consistent with TM can often prove to be the precursor for some other chronic disease process, like MS or NMSOD—meaning it would not thereafter be proper to say the affected individual had "experienced" an isolated case of TM that evolved into something else. Goh at 1268 Table 1 (noting that evidence supportive of MS, optic neuritis, or other infectious diseases are exclusionary criteria for a TM diagnosis). In addition, the orientation of a lesion—lateral (up and down) versus transverse (across)—is not a factor that excludes TM as a diagnosis, even though the effect of the lesion's positioning can be relevant to both diagnosis and treatment (and the very term

---

[23] "Myelitis" is defined as "1. Inflammation of the spinal cord, often part of a more specifically defined disease process. One group of diseases is named according to whether primarily white matter or gray matter is affected (leukomyelitis and poliomyelitis); another group is defined by whether there is coexistent disease of the meninges (meningomyelitis) or the brain (encephalomyelitis). In practice, the term is also used to denote noninflammatory lesions of the spinal cord. 2. Inflammation of the bone marrow." *Myelitis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32680&searchterm=myelitis (last visited May 8, 2026).

"*transverse* myelitis" incorrectly implies only lesions horizontal to the spinal cord as included). And finally, spinal cord injuries that present with symptoms that look like they are due to myelitis can be the product of literal, physical trauma—where neuroinflammation is a secondary result of that trauma.

Thus—and as numerous items of literature filed in this case suggest—it can be quite easy to *overapply* TM as a diagnosis to explain neurologic symptoms. Park at 2 (stating that "Transverse myelitis (TM) in particular should be excluded, as previous studies have reported that about 15% of patients diagnosed with TM were actually SCI patients"); Zalewski at 57, 61; Zalewski II at e97, e99. But nothing filed in this case stands for the opposite conclusion: that TM is likely to be mistakenly identified as an infarct.

MRI findings usually help treaters confirm the existence of TM (although as this case demonstrates, it can be very difficult to interpret what imaging actually "shows," with reasonable and qualified medical experts disagreeing on what the findings reveal). But imaging generally reveals what is the *source of TM's clinical symptoms: inflammation in the spinal cord,* often appearing as lesions. Zucconi Rep. at 10, 11. While initial imaging results may not strongly establish the presence of TM, they should be somewhat supportive of it (and may often reveal enhancement if contrast is used – evidence of an active inflammatory process sufficient to cause a breach of the blood-brain barrier). Evidence derived from sequential acts of imaging may later reveal progression as clinical, outward symptoms occur in real time. *See, e.g.*, *Greenslade v. Sec'y of Health & Hum. Servs.,* No. 14-1140V, 2024 WL 3527665, at *6–7, 26–28 (Fed. Cl. Spec. Mstr. June 28, 2024) (claimant's TM began pre-vaccination, given evidence of prior symptoms; first post-vaccination MRI (performed several weeks after earlier symptoms) revealed mild T2 signal intensity but no enhancement, and then claimant's symptoms continued to present and evolve over the following several days).

A spinal cord infarct can also involve symptoms comparable to what is seen in TM, but is distinguishable in nature and cause. Infarcts, or ischemia, reflect dead tissue attributable to a lack of blood supply to the cord's nerve tissue. As noted in Zalewski, spinal cord infarct can often be the product of a variety of risk factors, including hypertension, smoking, hyperlipidemia, and diabetes mellitus. *See* Zalewski at 58. Zalewski adds that "[o]nset is more protracted and radiologic distinction from competing diagnoses is more difficult than with cerebral infarction. Thus, patients with a spontaneous (i.e., nonprocedural, nontraumatic) [spinal cord infarct] often receive misdiagnoses." *Id.* at 57. Imaging does not always clearly establish TM over infarct or vice versa. In fact, imaging is not likely to identify infarct when performed fairly close in time to an individual's acute presentation. Park at 2; *Kouchak v. Sec'y of Health & Hum. Servs.,* No. 18-1279V, 2023 WL 6973017, at *5 (Fed. Cl. Spec. Mstr. Sept. 26, 2023) (*citing* Alblas at 222 (patients examined by MRI within 24 hours after symptom onset showed normal results in four of the five studied patients)).

One very important feature of infarct, however, is its acute nature, evidenced by a rapid progression to nadir in terms of clinical presentation and symptoms. Numerous items of literature filed in this case emphasize the fact that infarcts will clinically present with sudden, often-alarming symptoms, and a fast downward progression to nadir will occur within hours to a few days. Beh at 2 ("[a]n apoplectic event with deficits reaching the nadir in less than 4 hours indicates a vascular event," whereas TM is characterized by "neurologic deficits reaching a nadir within a few weeks"). Case law involving the TM-infarct diagnostic dispute are consistent in recognizing this timeframe to nadir distinction. *I.J. v. Sec'y of Health & Hum. Servs.*, No. 16-864V, 2021 WL 1232733 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), at *8, 18, *mot. for review granted on other grounds,* 155 Fed. Cl. 20 (2021).

TM can also present acutely, but is understood often to feature a longer course progression timeframe (as reflected in diagnostic criteria that envision progression to nadir in as long as 21 days). Working Group Criteria at 500 Table 1; *Pearson v. Sec'y of Health & Hum. Servs.,* No. 16-9V, 2019 WL 3852633, at *15 (Fed. Cl. Spec. Mstr. July 31, 2019) (onset to nadir can occur within a timeframe as long as two to three weeks, although within hours is possible). Thus, although there is some overlap in the specific timeframes for progression to nadir applicable to TM and infarct; and although TM can also present rapidly; the medical literature filed in this case stands for the conclusion that *infarcts generally progress much faster to nadir than TM.*

Another significant feature of TM that impacts my analysis is how it can be independently corroborated. In addition to imaging, CSF testing is important, since it can reveal indicia of inflammation in the cord, such as pleocytosis or other findings. First Price Rep. at 7 (referencing Beh at 97). Indeed, as Petitioner's experts acknowledged, some kinds of infections resulting in myelitis (bacterial meningitis, for example) would likely yield dramatically-high levels of CSF pleocytosis, consistent with the body's efforts to fight a wild and uncontrolled infection. Tr. at 71.

Prior Program claimants have received compensation for TM deemed to have been vaccine-caused (including by the flu vaccine). *See, e.g.*, *Schmidt v. Sec'y of Health & Human Servs*., No. 07-20V, 2009 WL 5196169 (Fed. Cl. Spec. Mstr. Dec. 17, 2009) (granted entitlement on a claim that an influenza vaccine caused Petitioner's TM via molecular mimicry). However, the specific factors of an individual vaccinee's medical history can impact success, even when the causal theory is found to have been preponderantly established. *See, e.g.*, *Palattao v. Sec'y of Health & Hum. Servs*., No. 13-591V, 2019 WL 989380 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (denying entitlement in TM case where petitioners failed to establish that timing of onset of symptoms was medically appropriate under their proposed causation theory).

As with this case, fact disputes have arisen in other matters as to whether a spinal cord injury was likely due to myelitis-related inflammation or more properly attributed to an infarct. *I.J.*, 2021 WL 1232733 (petitioner found to have more likely experienced TM over infarct). Special

44

master determinations have recognized that what "looks" like TM may often actually reflect an infarct. *See, e.g.*, *DeWit v. Sec'y of Health & Hum. Servs.,* No. 18-1353V, 2026 WL 822767, at *33–36 (Fed. Cl. Spec. Mstr. Feb. 25, 2026) (infarct more likely diagnosis than TM; evidence of enhancement and lesions only began to show up on imaging within a week or so of initially-acute onset, and predominance of signal in gray matter along with evidence of cord pathology and initial, if subtle, hyperintensity consistent with infarct); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-410V, 2025 WL 1942989, at *21–22 (Fed. Cl. Spec. Mstr. June 17, 2025) (claimant more likely suffered infarct than TM; initial MRI imaging did not reveal enhancement, CSF results were not abnormal, and treaters consistently included infarct in differential); *see also Broekelschen,* 618 F.3d at 1347-49 (special master reasonably weighed evidence in determining that injury was more likely an anterior spinal cord infarction than TM).

I recently resolved a claim in which the parties were locked in a similar "TM vs. infarct" diagnosis dispute. *See Ross v. Sec'y of Health & Hum. Servs.,* No. 22-136V, 2025 WL 3531575 (Fed. Cl. Spec. Mstr. Nov. 14, 2025) (Tdap vaccine not shown to have caused petitioner to experience TM). Some of the same kinds of considerations at issue herein were explored in *Ross.* There, after considering the opinions of competing neurologists, I found the TM diagnosis lacked preponderant support – even though I was unable to also determine that the infarct proposed by Respondent's expert *was* the more likely injury. *Ross,* 2025 WL 3531575, at *18. In particular, the evidence in that case established inconclusive MRI results despite an acute presentation. *Id.* And there was a temporal gap between the Petitioner's vaccination and subsequent onset, but with no intervening medical concerns, undermining the conclusion that the petitioner had been experiencing some kind of subclinical, antibody-driven inflammatory process before onset. *Id.* In addition, DWI techniques that could have confirmed an infarct were never performed (whereas here they were utilized – and deemed by treaters supportive of infarct). *Id.* at 19. Thus, although the diagnostic question was difficult, and evidence existed to support TM, balancing the evidence in its totality weighed against TM. *Id.*[24]

All of the above establishes that TM is not automatically the correct diagnosis by default, simply because the spinal cord is involved—and even where the clinical/testing evidence is somewhat inconclusive. The very existence of ambiguity in interpretation of imaging results underscores the possibility that clinical symptoms attributable to a spinal cord injury are not automatically *likely* to reflect TM. And as is true in any Program case, in instances where diagnosis is disputed, the evidence in its totality must be considered carefully.

---

[24] I also note, however, that the *Ross* petitioner possessed a number of infarct risk factors totally absent from this case. *Ross,* 2025 WL 3531575, at *18. This is one of several reasons why I do not find that the evidence tips in *favor* of infarct, and I certainly do not on this record presume to propose what most likely caused Petitioner's cord injury. But it remains the case, as discussed below, that the totality of evidence does not weigh in favor of TM—even if it is completely true that Petitioner lacked the kinds of classic risk factors associated with infarct (smoking, age, obesity, etc.).

## II.    Petitioner Did Not Likely Experience TM

Petitioner places all of her causation emphasis on the contention that she likely experienced TM. She expressly does *not* endeavor to prove the flu vaccine can cause spinal cord infarcts. Tr. at 4, 5. And Petitioner bears the burden of proving her proposed diagnosis by a preponderance of the evidence. *Broekelschen,* 618 F.3d at 1346. Thus, a determination that she did not experience TM is fatal to the claim. *Id.* at 1349 (appropriate for special master to evaluate diagnostic dispute before reaching *Althen* analysis).

I do not purport to diagnose Petitioner, nor am I qualified to do so. And I cannot say it is certain, or even *likely*, that she experienced an infarct. But after balancing the competing evidence on the diagnosis question and weighing it in totality, I conclude the evidence does not preponderate in favor of a TM diagnosis—and the ample proof that supports an infarct diagnosis is integral to that determination.

My determination relies on several different categories of evidence, and I address them by grouping each according to topic.

*Acute and Rapid Progression of Petitioner's Initial Clinical Symptoms*

One of the most compelling factors leading me to disfavor TM as preponderantly established was Petitioner's extremely short, early clinical course. The record preponderates in favor of the conclusion that Petitioner's progression from onset to nadir took *no more than* five hours, and likely a bit less. Petitioner arrived at the ED by 1:15 – 1:20 pm reporting tightness and pain in her back, numbness and tingling in her bilateral lower extremities, and altered sensation in her lower and upper extremities. Ex. 5 at 12, 19–20. Later that same afternoon, she reported the onset of the acute pain and sensations that lead her to seek emergency care as beginning two hours prior, or around 12:30 pm. Ex. 5 at 12. In addition, at the time of her arrival at the hospital, Petitioner was still able to walk, but not long after she could no longer lift her left leg, and had decreased ability to move her right leg. *Id*. By the time of admission to the ICU (close to 5:30 pm), she could not move her extremities at all. *Id.* at 32, 37.

Petitioner's experts correctly observed that the temporal criteria for TM and infarct overlap somewhat, and both allow for onset to nadir timeframes to occur within a four to five-hour period. There certainly is no bright-line rule for deciding when something suddenly stops being infarct and becomes TM, based solely on the timing of downward symptoms progression. But it can be gleaned from the independent evidence filed in this matter that a rapid onset to nadir timeframe is *more likely* supportive of an infarct, which occurs abruptly, than TM (where an inflammatory process causing harm will take time to evince downstream clinical symptoms—and can unfold over many days). Beh at 2; *see also* T. West et al., *Acute Transverse Myelitis: Demyelinating,*

*Inflammatory, and Infectious Myelopathies,* 32 Semin. Neurol. 97 (2012), filed as Ex. C-6 (ECF No. 24-7), at 100 ("[i]n acute transverse myelitis, symptoms typically develop over hours to days *and then worsen over days to weeks*") (emphasis added). And timeframes slightly longer than four or five hours are still consistent with infarct if they remain compressed. *See, e.g.,* Zalewski at 60, Box (proposing a timeframe of less than 12 hours to nadir as suggestive of infarct); Yadav at 2811 (setting forth a timeframe of 72 hours from onset to "peak" severity as consistent with infarct). Thus, the clinical evidence alone from Petitioner's first day at the hospital strongly supports infarct over TM.

To get around such a rapid and obviously-catastrophic symptoms progression, Petitioner's experts have attempted to identify later occurrences in her treatment as her "true" nadir. In particular, Dr. Pachner referenced the need for intubation on the morning of December 10th, suggesting this should be viewed as her nadir. However, the totality of the medical record evidence suggests that this treatment step alone was not reflective of nadir, but instead illustrates the overall severe nature of her condition. Petitioner was clearly experiencing respiratory issues *prior* to this point. Ex. 5 at 37. In addition, the record supports the conclusion that the decision to intubate reflected some thinking about the breathing devices and processes being utilized, as opposed to a clinical symptom as concerning as Petitioner's immediate progression to quadriplegia *the same day* she sought emergency care—and within hours of initial pain. TM, of course, could unfold in a slower, more stuttering manner, and thus a two-day progression is consistent with it—but the medical record weighs against the determination in this case that progression to nadir took that long.

*CSF Findings*

Also significant in evaluating diagnosis is the lack of corroborative testing evidence that Petitioner was experiencing a neuroinflammatory-caused condition impacting her spinal cord. TM involves *inflammation-driven harm*, but the record does not preponderate in favor of the conclusion that Petitioner was experiencing CNS inflammation of the sort associated with TM in early-December 2019.[25]

Petitioner's initial CSF testing was at best faint evidence of active spinal cord inflammation. The first CSF testing (performed December 8th) unquestionably produced normal results. Ex. 5 at 1401. Thus, as of the day of Petitioner's catastrophic onset and rapidly-downward clinical progression, lab work did not confirm the presence of an inflammatory process that could

---

[25] There is evidence that as Petitioner's disease process progressed, she *later* likely experienced neuroinflammation—as confirmed by MRI results and treatments aimed at curbing such inflammation. But this could occur secondarily to another ongoing, or completed, disease process. For TM to best explain Petitioner's condition diagnostically, *that inflammation would have to come first,* before clinical symptoms manifested of the sort she experienced on December 8, 2019.

47

secondarily be leading to those very same symptoms *that were at that time present*. It is not clear, nor has Petitioner shown otherwise, how such rapid progression of clinical symptoms to nadir would be accompanied by a *lack* of evidence of existing inflammation (and Dr. Pachner's analogy to MS brain inflammation as not showing up in the cord were unpersuasive for a disease process alleged to have mostly if not solely impacted the spinal cord). This is so even if CSF testing does not always immediately display strong evidence of inflammation in the cord in cases of TM.

The next round of CSF testing occurred December 18th, 10 days after onset. By this point, there was evidence of a *slightly* elevated WBC count—but not particularly high (even if the hospital's somewhat uncommonly-used range of 1-10 is disregarded, in favor of a lower, 1-5 range). As Dr. Price persuasively explained, evidence of the *degree* of inflammation is what matters, as opposed to simply evidence of a WBC count exceeding the normal range. Tr. at 402–03. And here, the degree of abnormality in WBC levels was not indicative of an uncontrolled inflammatory process at work.

I deem these results to be inconsistent with the proposed TM diagnosis (even if they do not fully rule it out).[26] As Dr. Price persuasively established, testing should have revealed a more fulminant level of inflammation earlier on, especially given the severe nature of Petitioner's presentation. Dr. Price also offered literature demonstrating (at least for the relevant sample in the study) that mild outcomes were consistent with *lower* levels of pleocytosis and thus the levels Petitioner's CSF testing revealed should not have been paired with the kind of severe symptoms that she had experienced *more than a week before* the second round of testing. *See,* e.g., Sellner at 314.

*Imaging Evidence – Progression in December 2019*

I give weight to the imaging results, as interpreted and explained by the parties' radiologic experts. Those most relevant to my determination are from Petitioner's December 2019 presentation, for they are the most contemporaneous findings shedding light on the nature of the disease process at issue, as seen at the time she presented with sudden and alarming deficiencies. As noted above, TM can be corroborated with proof of inflammation seen on MRI—perhaps (in a case involving an acute clinical presentation, as here) evident from the very first imaging obtained.

---

[26] The inconsistency of Petitioner's CSF testing results becomes more powerful, however, in analysis of the second *Althen* prong, when the date of vaccination—more than a month prior to onset—is taken into account. If the flu vaccine triggered an autoimmune process in which antibodies cross-reacted with spinal cord nerve myelin, resulting in harm from inflammation, then *why* did CSF testing not establish the presence of a significant inflammatory process? Petitioner's experts unpersuasively argued that TM could still occur despite such lackluster testing corroboration (while at the same time contending that a count of 11 WBCs—whether the range for normal was 1-5 or 1-10—was alarming proof of an inflammatory process at work, even while their own literature offered on this point characterized it as mild). R. Fishman, *Cerebrospinal Fluid in Diseases of the Nervous System* (1980) at 175.

In many cases, such imaging would be critical in steering treaters toward a TM diagnosis, as well as in fashioning what modalities would be adopted to address the illness.

Here, the initial MRIs performed December 8th (the same day as Petitioner's acute symptoms, and as those symptoms were progressing in an alarming manner) appeared normal. Both of the testifying radiologists in this case deemed this to be in error—but neither could convincingly establish that the first obtained images *favored* one kind of disease process over another. Dr. Zucconi, however, expressly denied the initial image revealed enhancement, and Dr. Bajakian in response maintained that "[o]n [Petitioner's] MRI studies there is mild diffuse cord enhancement on December 8 and 10, 2019, which becomes thick and irregular peripheral ring like enhancement on the December 18, 2019 examination," and that "[b]oth appearances are extremely atypical for spinal cord infarct, but are not unusual for acute transverse myelitis." Second Bajakian Rep. at 2. And literature filed in this case supports the conclusion that initial imaging is not likely in any event to "show" the presence of an infarct. Park at 2 ("[e]arly recognition of SCI immediately after the onset of symptoms is difficult," and "early detection of SCI by imaging alone is difficult").

Thus, the very first set of images were not all that supportive of *either* proposed diagnosis (other than to suggest, in the views of both neuroradiologic experts, that some unidentified kind of active harmful process was already occurring). And some weight should be given to the fact that contemporaneous treaters, aware of the severity of Petitioner's clinical presentation, did not at least see obvious or alarming evidence one way or another in viewing the first set of images. Accordingly, no real conclusion can be drawn from the very first images that favors or disfavors either side's proposed diagnosis.

The next set of MRIs (performed the evening of December 8th), however, start to point away from TM. Importantly, DWI imaging (which would be used mainly to address the possibility of an ischemic problem) was employed—and although it alone did not establish which diagnosis should be favored, enhancing findings were still not being obtained, despite the fact that Petitioner's clinical presentation was so concerning and acute. Ex. 5 at 40; Goh at 1274 ("[d]iffusion-weighted imaging (DWI) of the spine allows a more confident diagnosis of cord ischemia"). In addition, Dr. Zucconi noted the presence of "pencil-like hyperintensities" in these images (Zucconi Rep. at 3, 4) that would be often observed in infarcts (and Dr. Bajakian did not deny their presence, although he disputed their diagnostic significance). Tr. at 147; Yadav at 2819 (noting that "pencil thin hyperintensity" is looked for when assessing if imaging is consistent with an infarct). These images, taken in combination with the first set, are more supportive of infarct.

The third set of MRIs, from December 10th, revealed that the subtle T2 signals that Drs. Bajakian and Zucconi observed from the MRI performed two days before were now also evident to contemporaneous radiologists—and this finding was (as recognized by Petitioner's treaters)

thought to be consistent with TM or some other kind of demyelinating condition. First Bajakian Rep. at 5, 8. Also significant to this set of images was the vertical/longitudinal orientation of the segment revealing inflammation. That particular round of imaging could have answered the diagnostic question in this case—were it not for the imaging *next* obtained a little over one week later, on December 18, 2019. Zucconi Rep. at 7; Ex. 5 at 67, 1086. By this point, the specific nature of the signal progression now suggested something (predominantly gray matter involvement) more consistent with an infarct than TM—and that was corroborated by DWI findings as well. The contemporaneous radiologist thus now favored an infarct process over TM. Ex. 5 at 1086 (noting "overall features are most suggesting of a subacute cord infarct which is best appreciated by the gray matter involvement in the upper thoracic spine").

Accordingly, the progression of MRI findings over a ten-day period tells a story of faint/nonspecific evidence of spinal cord damage that is not particularly supportive of TM. At the same time, techniques specifically significant for confirmation of infarct were not only employed but yielded results consistent with infarct, and findings were made about the locus of signal hyperintensity also favoring infarct. Enhancement may have been more evident over time, but this is consistent with what would be seen in the wake of cord damage attributable to the tissue harm caused by the infarct. Alblas at 291 (for infarct, "gadolinium enhancement becomes visible after about 3 days in the ischemic area due to damage to the blood-brain barrier"). Collectively, these findings better support infarction over TM (and thus undermine TM as the more likely diagnosis—even if the actual diagnosis remains uncertain at this time).

Dr. Bajakian interpreted this imaging sequence in a totally different fashion—but the opinion he offered frequently crossed the line into advocacy rather than reflecting a neutral reading of the evidence. Consistently, in any instance in which an MRI image could be read to favor TM (including the December 10th result which expressly did so), he embraced it, as if a bright line separated the results from infarct. By contrast, he underplayed every negative or alternative finding as nonspecific, or something consistent with *both* TM and infarct.

Dr. Bajakian's contentions about the involvement of gray matter in the spinal cord, or general localization of signal intensities, as evidenced on MRI reflect this kind of motivated reasoning that often characterized his testimony. Dr. Zucconi's general point was that the damage from an infarct would be mostly attributable to gray matter cord involvement, and hence would "show up" there on imaging, whereas inflammation-driven harm characteristic of a myelitis would be more indiscriminate. Zucconi Rep. at 10. The literature says as much. Zalewski II at e101, Fig. 4. By contrast, where imaging performed on Petitioner suggested primarily grey matter involvement, Dr. Bajakian simply discounted its significance, or deemed common to TM and infarct. Tr. at 155; *compare* Zalewski at 62 (finding that "[a] linear craniocaudal strip of enhancement is typical of SCI [ ], highlighting the most predominant ischemic are (gray matter, arterial territory), and such a pattern is unusual with inflammatory etiologies"); Goh at 1273

50

("[d]ue to high metabolic demand of cell bodies, gray matter is the site most sensitive to ischemia"). In effect, Dr. Bajakian's view was "TM can also feature gray matter involvement."

Dr. Bajakian similarly stressed the view that the images often revealed signal outside the anterior portion of the cord. Tr. at 154, 169-71. But in so doing, he seemed to assume as if the only kind of infarct possible is an ASA infarct—despite literature suggesting this kind of "all or nothing" reasoning is in error. Zalewski at 59 (neuroimaging of nearly half of spinal cord infarct patient sample revealed posterior cord involvement), 61 ("[f]eatures often considered to be atypical (e.g., 4 hours to nadir, *MRI and clinical evidence outside the anterior spinal artery territory*, gadolinium enhancement) *are actually common* and should not preclude physicians from making the diagnosis of [spinal cord infarction]") (emphasis added). While an anterior cord infarction may be a common form of infarction, other forms exist as well, and it is therefore incorrect to define infarction *only* to mean where the clinical indicia of an anterior cord infarction are present. Vargas at 825-26 (reviewing multiple forms of infarction and their differing clinical manifestations). Dr. Zucconi, by contrast, more persuasively demonstrated an analytical approach that took into account the totality of evidence, and he proved more willing to concede ambiguities in the record, making him more trustworthy in his overall interpretation of this aspect of it.

Unquestionably, it is exceedingly difficult to reach anything close to a definitive conclusion as to diagnosis based solely on any single image, or even a set of images obtained at the same time. Both experts could point to aspects of the imaging that supported their views; both were qualified to read, and interpret, the imaging; and both made persuasive points. As a special master, I of course lack the capacity to interpret what the actual images "show" on my own—and even after hearing testimony and being guide through the images, I cannot identify "smoking gun" proof favoring (or rebutting) either side's position.[27] But what I am called upon to do here is to weigh the expert *interpretations* of these images—based upon my assessment at trial of their persuasiveness and credibility, and in light of the totality of evidence. Performing that function, I conclude that the December sequence of imaging is less favorable to the TM diagnosis.

### Other Specific Imaging Findings

The radiologic experts discussed numerous other aspects of the imaging findings, and did not always agree as to their significance. It clearly is the case that *some* of these findings fit better with Petitioner's proposed TM diagnosis. But this does not change my overall conclusion.

---

[27] I am not including in my Decision reproductions of the underlying images, or affirmative statements about how I personally comprehend them after hearing expert testimony. The reading and interpretation of this sub-category of evidence involved esoteric, narrow medical expertise that only experts like Drs. Bajakian or Zucconi possess. Even after a lengthy trial I cannot point to one image that a lay person could view and then understand as supporting or rebutting one side's diagnostic contentions.

Petitioner did, for example, offer some reliable evidence supporting the contention that all things being equal, a "longer" lesion is more consistent with TM than infarct. *See, e.g.*, Park at 7. The length of the lesions seen in imaging here are thus somewhat supportive of TM. Petitioner did not, however, successfully establish that there is an agreed-upon general length for TM lesions that routinely exceeds an infarct lesion's length. Some of the literature relied upon by Petitioner for this point involved comparison of the different sizes of neuroinflammatory conditions in demyelinating diseases (such as MS vs. TM vs. NMOSD), rather than contrasting the length of TM lesions versus infarct. *See, e.g.*, M. Wingerchuk, et al., *International Consensus Diagnostic Criteria for neuromyelitis Optica Spectrum Disorders*, 85 Neurology 177 (2015), filed as Ex. 64 (ECF No. 31-2); Lee at 1828 Fig. 4 (comparing lesion length in different demyelinating diseases). And articles like Zalewski establish that (at least for its studied sample) long, vertical lesions were fairly common in infarct. Zalewski at 59 Table 2 (60 percent of 126-patient spinal cord infarct sample displayed longitudinally-extensive lesions greater than three vertebral segments).

The evidence about where a lesion would appear on the spine, as reflected in imaging (cervical/thoracic, only thoracic, lower thoracic to lumbar), and what it says about the competing diagnoses, was similarly equivocal. Dr. Zucconi did acknowledge observing lesion activity in the cervical to upper thoracic level. Zucconi Rep. at 3–6. And a colorable argument was advanced that infarcts would more often than not impact lower parts of the spine. Park at 7 "[p]revious studies have also reported that SCI is mainly distributed across the lower thoracic, cervical, and conus levels," whereas TM lesions are "mainly distributed across the cervical and upper thoracic levels").

However, some of the evidence offered to show where a TM lesion would be expected to appear was based on comparison with other forms of *demyelinating* injuries. *See* Lee at 1828 Fig. 4. In addition, Park's sample was quite small, and involved evaluation of only 14 patients who had experienced infarct. Park at 5 Table 3. By contrast, larger studies (Zalewski in particular) featured infarct-consistent imaging revealing lesions in a variety of spinal cord sections. Zalewski at 59 Table 2 (of 126 patients in sample, 30 percent displayed lesions at the cervical level, 27 percent at the thoracic level, and 15 percent cervical through thoracic level). Accordingly, this contention only *slightly* supports Petitioner's TM diagnosis argument. Significantly, however, it is undercut by other evidence that I include in my overall weighing process – not only that the best diagnostic criteria for TM or infarct do *not* identify lesion location as a primary criterion (*compare* Zalewski at 50 *with* Working Group Criteria at 500 Table 1), but also by the other observations Dr. Zucconi made to explain why he favored infarct.

The presence or absence of proof of cord swelling, along with when it showed up in the course of imaging, was also a factor that did not clearly support or rebut Petitioner's proposed TM diagnosis. Although Dr. Bajakian strenuously maintained that swelling and edema were more associated with TM than infarct, this position was not fully substantiated, and certainly not demonstrated to be a bright-line factor in assessing the presence of TM from imaging. Dr. Zucconi, by contrast, saw no swelling early on, but did identify it as occurring in later sets of images,

52

maintaining this revealed a secondary, post-onset process. Tr. at 253–55. At best, the experts battled this particular issue to a draw—favoring Petitioner a bit, but not significantly.

Overall, for purposes of making a determination as to whether Petitioner carried her burden on proving her most likely injury, this set of arguments did not sufficiently advance her cause. For the evidence filed in this case consistently notes that diagnosing TM is more a function of evaluating imaging results in coordination with *other* criteria, rather than reliance on the imaging above all else, or giving particular weight to sub-findings like lesion location or length. Working Group Criteria at 500, Table 1; Beh at 80–84. Applicable diagnostic criteria do not specify lesion length, location, the presence of swelling, or other factors as extremely important in making a TM diagnosis (at least in comparing TM with infarct). Rather, what matters is the totality of evidence, incorporating clinical features, lab testing, and imaging all together. It is in weighing these items collectively that I reach the conclusion that TM was inadequately supported.

*Additional Arguments Against Infarct Proposed by Petitioner's Experts*

Petitioner's experts highlighted some other factors that were not wholly consistent with infarct. But I do not give these instances great weight, and ultimately deem them more general evidence of the difficulty in this case in distinguishing infarct from TM, rather than as significant proof supporting TM.

For example, both Drs. Pacher and Bajakian made much of the fact that one of Petitioner's initial treaters expressed doubt about the likelihood of infarct, due to the fact that "vibration sparing" was not clinically evident. First Pachner Rep. at 8, 15; *see also* Tr. at 75–76. It is true that the section of the cord that usually would not be affected by an *anterior* cord infarction could continue to function even while other motor functions below the level of harm were impacted, consistent with the frequent territorial limits of the infarct. Park at 7. However, the treater comment in question occurred on December 8th—the day of Petitioner's onset—and seems to have been occasioned by the fact that the "pro-infarct" MRI technique of DWI was being employed. Ex. 5 at 55. Hence, the treater comment can be inferred to express some hesitation (at that time( in fully embracing an infarct diagnosis. Later MRI results, however, were more affirmatively interpreted by treaters as proof of infarct, with no further mention of vibration sparing as bearing on diagnosis. Ex. 1 at 67. Thus, the presence or absence of vibration sparing herein is not a strong factor in favor of TM over infarct.

The vibration sparing importance to the diagnostic dispute was also somewhat overstated by Petitioner's experts—consistent with their practice of diminishing the significance of infarct-consistent factors, like gray matter involvement, as something common to TM as well, while exaggerating the significance of other findings that they felt undermined infarct as the diagnosis. And as Dr. Price noted, Zalewski does not even deem vibration sparing to be a relevant sensory

clinical factor in assessing the existence of an infarct (although Zalewski does identify other kinds of factors, like "selective pain/temperature loss" as significant to the diagnosis). Zalewski at 58 Table 1.

Petitioner similarly references the severity of her injury (quadriplegia) as supportive of TM, maintaining that infarct less commonly involves the same degree of clinical harm. *See* Ex. 171 (*comparing* Al Deeb at 1116 Table 2, 1117 (11 of 32 sample of patients experienced quadriplegia) *with* Park at 4 (one out of 14 patients in sample experienced infarct-caused quadriplegia)). But this factor is not even a diagnostic criteria for infarct. *See,* e.g., Zalewski at 60 (Box setting forth proposed criteria). Moreover, the literature consistently notes a possible range of clinical outcomes, from less to more severe, depending upon the location of the infarct or its extensiveness. Zalewski at 58 Table 1; Yadav at 2814; Vargas at 826 (noting several admittedly "less typical presentations" involving worse symptoms). Just as TM can be more or less severe, the same is true of infarct, and thus I do not give great weight to this proposed distinction (whereas I *do* give more weight to the short progression to nadir, lack of confirmatory imaging, and minimal proof of CSF inflammation).

Petitioner's experts also correctly noted that some possible infarct-associated explanations, like the presence of a vertebral body infarct, were not confirmed by the record in this case. And Petitioner clearly did not possess the kinds of risk factors (age or personal health issues like smoking or high blood pressure) associated with an infarct. I wholly concur that the record herein does not permit a finding of a *most* likely cause of Petitioner's injury, and it is *not* my conclusion that she more likely than not experienced an infarct. But again—this does *not* mean the likelihood she experienced TM has been established in the alternative. The pro-infarct evidence found in this case greatly undermines a finding of TM as the best-supported diagnosis.

I also stress that my determination on the issue of diagnosis does not require me to pinpoint a most likely cause for Petitioner's symptoms. A special master's entitlement determination allows the conclusion that the cause of a given injury was idiopathic, meaning *no* etiology could be provided. *Astle v. Sec'y of Health & Hum. Servs.*, No. 14-369V, 2018 WL 2682974, at *19 (Fed. Cl. Spec. Mstr. May 15, 2018) (noting that it is not necessary for the special master to diagnose an exact condition"). While this record may lack proof of a cause *consistent* with infarct, it remains the case that evidence supporting an infarct diagnosis is too prevalent in the record to ignore.

*Dr. Bennett's Opinion*

I give Dr. Bennett's embrace of TM as the proper diagnosis limited weight. For starters, it does not appear he encountered Petitioner on more than two occasions. Ex. 7 at 2 (documenting Petitioner's first encounter with Dr. Bennett on July 27, 2020) and 8 (August 31, 2020 telehealth visit). Dr. Bennett also saw Petitioner *more than six months* after her onset, and thus his diagnostic views do not reflect an initial, on-the-ground experience with her course. Moreover, the records

from his treatment of Petitioner not only do *not* show why TM would be more likely than infarct, but allow for the reasonableness of including infarct in the differential. *Id.* at 2. And the short treater reports he prepared are cursory, rooting his favored diagnosis more in the context of why it could be associated with the flu vaccine than why it is the more likely "correct" diagnosis. I am never bound by an individual treater opinion, even if it should be given some weight. *Snyder*, 88 Fed. Cl. at 746 n.67. But in this case, there are compelling reasons to afford it even less evidentiary consideration, regardless of Dr. Bennett's personal qualifications as a neurologist.

### *Value of Testifying Expert Opinions in Light of Totality of Record*

My resolution of the diagnosis dispute stems in part from how I have weighed the competing testimony of the experts. Both sides offered qualified experts to support their litigation positions, and the subjects upon which they have opined were not only reasonably disputed, but presented very difficult medical and scientific questions. But I found Respondent's experts more persuasive.

My analysis relied particularly on balancing the probative value and persuasive nature of the competing radiologic expert opinions. I have favored the opinion offered by Dr. Zucconi. As noted above, Dr. Zucconi was persuasively measured in his reading of the images, allowing for ambiguities and points that did not favor his interpretation. His opinion was bulwarked by a professional willingness to admit that the evidence was far from crystal clear, despite the opinion he offered. Dr. Bajakian's arguments, by contrast, often amounted to overstating favorable interpretations, while unpersuasively (and sometimes categorically) discounting evidence inconsistent with his opinion as either unimportant or as incapable of "ruling out" TM. Of course, Respondent has no burden of proof in most Vaccine Act cases,[28] and need only offer evidence that undermines a proposed issue or claim element. *La Londe,* 110 Fed. Cl. at 198 ("[r]egardless of whether the burden ever shifts to the respondent, the special master may consider the evidence presented by the respondent" when determining if petitioner's initial burden has been met); *Randolph v. Sec'y of Health & Hum. Servs.*, No. 15-146V, 2021 WL 5816271, at *21 (Fed. Cl. Spec. Mstr. Nov. 12, 2021) ("[c]ausation claims do not succeed merely because Respondent cannot prove with certainty what was causal").

This advocacy approach to evidence unsupportive of the TM diagnosis was in fact consistently—but unpersuasively—employed by *both* of Petitioner's experts. If evidence suggested signal issues predominantly in the gray matter of the cord, Drs. Pachner and Bajakian maintained that this did not "rule out" TM. If Petitioner's symptoms progressed in an uncommonly rapid manner more suggestive of infarct—well, TM could progress quickly also. If DWI was a technique usually used for diagnosing infarcts, it was also useful for TM since it was "possible"

---

[28] The only exception is when the burden shifts to Respondent (after a successful *prima facie* showing by a petitioner) to prove a "factor unrelated" was causal of a given injury – but in this case I do not find such a shift occurred.

55

TM could sometimes be identified utilizing this technique. And even if TM usually would involve better proof of active cord inflammation as determined by CSF testing, it did not matter, because TM did not "always" present this way. Such efforts to broaden TM to cover every unfavorable piece of evidence damaged somewhat the credibility of Petitioner's experts (who would have been better off striving more to show why the totality of evidence *still* favored TM, despite some features unsupportive of the diagnosis).

As noted, the literature strongly supports the conclusion that infarct diagnoses are frequently missed, with infarcts misclassified as TM. But Dr. Bajakian's testimony often seemed to assume that this was because infarcts are limited to a very narrow set of clinical and imaging circumstances. This case alone obliterates that contention—for regardless of what diagnosis is correct, there was ample evidence to support *either* (as reflected in the very fact that the contemporaneous treaters themselves struggled to pinpoint an explanation).

*Summary Of Diagnostic Determination*

I have hesitated reaching a negative decision on diagnosis in this case, given the abject severity of Petitioner's injury. I struggled to look carefully at the record and expert opinions. Petitioner's claim involves extremely difficult-to-parse medical and scientific issues. The imaging alone is subject to a myriad number of possible interpretations. It would be infinitely easier simply to find there is *just* enough record evidence to support Petitioner's proposed diagnosis, awarding her funds that would undoubtedly improve her life, while not looking too closely at the record in its totality.

Unfortunately, the weighing process I must engage in as the neutral assigned to resolve the claim resulted in an outcome I could not ignore. The fact that this weighing process was difficult does not mean the evidence was in equipoise, such that a "tie" should go to the Petitioner. As much as I would personally like to award her damages, I do not find sufficient preponderant evidence to support the conclusion that she likely experienced TM.

## III.    The Second *Althen* Prong was Unsatisfied

It is well understood in the Vaccine Program that all *Althen* prongs must be satisfied for a Petitioner to receive compensation. *Althen*, 418 F.3d at 1278. As a result, the failure to substantiate only one the three prongs is grounds for denying entitlement – even if the other prongs could be satisfied. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 2014). In addition to diagnosis, this case turns on Petitioner's inability to satisfy the second, "did cause"

56

*Althen* prong. Assuming that the flu vaccine can cause TM,[29] *and* that Petitioner did experience TM (a finding I have not made), this record does not preponderantly establish Petitioner's vaccination was *likely* causal of that injury.

Analysis of the second *Althen* prong is not an empty exercise (even though it is often treated as such). *Capizzano*, 440 F.3d at 1327. Claimants sometimes proceed as if once the first, "can cause" *Althen* prong is met, they need only point (in circular fashion) to the existence of the injury, recite the magic words "logical sequence of cause and effect," and then be found to have established the vaccine in question was likely responsible for their injury. In fact, a petitioner's success in satisfying the second prong is subject to the same general preponderant standard applicable to all claims—and that means there must be some kind of *evidentiary* showing suggesting it is *likely* the vaccine caused the relevant injury to the claimant, independent of the vaccine's general causal capacity. Consideration of the record in its totality is how a special master determines this prong has been met (the same kind of holistic review informing my diagnosis determination).

Prior Program decisions recognize that although TM may be less acute than infarct in terms of progression of clinical symptoms to nadir, it nevertheless presents *acutely* in another respect: when measured from the time/date of an allegedly-causal trigger. *See, e.g.*, *Handjis v. Sec'y of Health & Hum. Servs.*, No. 18-1044V, 2022 WL 17852426, at *16 (Fed. Cl. Dec. 5, 2022) ("[i]f one were to accept that petitioner received a high dose flu vaccine on December 10, 2015, and presented on December 14, 2015 with symptoms that were ultimately diagnosed as TM and supported by objective testing, then petitioner would have satisfied [*Althen*] Prong III"); *Raymo v. Sec'y of Health & Hum. Servs.*, No. 11-0654V, 2014 WL 1092274, at *10, *19 (Fed. Cl. Spec. Mstr. Feb. 24, 2014) (onset of TM occurred between three to four days after vaccination and was consistent for an immune mediated disorder).[30]

Thus, in situations where there is a more obvious temporal lag from vaccination to onset, there should still be something in the medical record suggesting a link with the vaccine. I have therefore reasonably required claimants to point to record evidence suggesting that a disease process resulting in TM was underway—and this cannot always be done, especially if weeks separate onset from the date of vaccination. *Bender v. Sec'y of Health & Hum. Servs.*, No. 11-

---

[29] As I repeatedly informed the parties at trial, I am cognizant of ample Program decisional authority supporting the conclusion that the flu vaccine can cause TM in susceptible individuals. Thus, in the event this decision is successfully appealed, I would unquestionably be prepared to find the first prong had been satisfied.

[30] Although the timeframe from vaccine to onset can also be evaluated under the third *Althen* prong, I am analyzing this question more broadly, as part of the "did cause" analysis. An onset of flu vaccine-caused TM might well be medically acceptable if occurring within five or six weeks of vaccination, as here. But this does not also mean Petitioner's TM *was* likely vaccine-caused, without other corroborative record proof.

693V, 2018 WL 3679637 (Fed. Cl. Spec. Mstr. July 2, 2018), *mot. for review den'd,* 141 Fed. Cl. 262 (2019).

*Bender* is an instructive parallel determination. The *Bender* petitioner received two covered vaccines, and then went on to experience what was agreed by both sides to be properly diagnosed as TM, beginning within 42 days after vaccination—thus not much longer than the timeframe in this case, and with no evidence in the intervening period of any vaccine reaction or initial, possibly-neurologic symptoms. *Bender,* 2018 WL 3679637, at *1–2. In denying entitlement, I noted that the claimant had only pointed to evidence that possible alternative causal explanations for her TM had been ruled out—but that she had not otherwise offered much in the way of preponderant evidence showing how the vaccines "did cause" her injury (especially given the lag to onset). *Id.* at *35–35. In particular, I observed that

> a wide variety of indirect and circumstantial evidence can be offered to support *Althen* prong two, whether in the form of test results, record evidence of symptoms, or witness testimony as to an injured party's state at the relevant time. Such evidence is lacking in this case. Petitioner cannot point to anything in the 42-day period prior to her first symptom that would suggest that a vaccine-caused autoimmune and inflammatory process was in fact under way. She also cannot identify record evidence from the time of her initial treatment that would give circumstantial support to her theory. No medical test results shed light on the matter (besides confirming her TM).

*Id.* at 34.

Here, as in *Bender,* Petitioner's medical condition prior to her December 2019 onset was wholly quiescent, devoid of any evidence of vaccination reaction, with weeks passing between the date of vaccination and onset that revealed nothing suggestive of what was to come. There is therefore no affirmative, direct evidence in this record—beyond the actual fact of a spinal cord injury—linking Petitioner's receipt of the flu vaccine on October 31, 2019, to the medical tragedy that befell her more than a month later.

In addition, evidence from Petitioner's treatment history does not support the conclusion that an autoantibody-driven, cross-reactive, autoimmune process attributable to vaccination had likely begun in the weeks separating vaccination from onset.[31] Her CSF testing largely did not reveal the presence of a significant inflammatory process occurring when her immediate symptoms. The first set of such testing actually yielded normal results—hardly consistent with an antibody-driven autoimmune process attributable to a vaccine received 38 days before. How can

---

[31] Although this Decision does not discuss Petitioner's theory of causation under the first *Althen* prong, it appears to be the kind of theory often advanced in Program cases: that the flu vaccine, due to mimicry with nerve component proteins, causes the creation of autoantibodies that mistakenly cross-react with self, leading to injury. *See generally* Bradfute Report (ECF No. 53-1) at 1–5; First Pachner Rep. at 12–13.

this early absence of evidence of spinal cord inflammation be reconciled with Petitioner's obviously-severe immediate symptoms? Even if there might be occasions in which CSF evidence of spinal cord inflammation lags clinical symptoms, this is less likely when a claimant suffers a notably-acute injury *within the span of a few hours*, as here. And then why did the second round of testing, performed ten days after her December 8th ED visit, only reveal at best a slightly-elevated WBC count? Even if I accept Petitioner's experts' argument that the proper range for normal WBC levels should be 1-5, a count of 11 is not notably elevated, as Respondent's experts persuasively established.

Petitioner *can* point to the fact that treaters excluded a number of alternative possible explanations for her severe injury, even though efforts were made to test for a large number of them. And no other evidence has been offered that would provide an etiologic explanation for Petitioner's spinal cord injury, despite some efforts by Respondent's experts to speculate as to possible causes. Nevertheless, this *does not* leave the vaccine as likely causal, simply because it was "known" to have occurred, while other possible explanations have been eliminated. Medical science recognition that in rare cases a vaccine can cause a particular injury does not also mean the same vaccine is likely responsible for what follows its administration in *all* cases. And as noted above, causation never turns on the special master making a final evaluation of the most likely cause of a given injury, any more than Respondent has an affirmative burden to prove such an alternative explanation. *Exum v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 681, 709 (2025) (holding that "the burden only shifts to the respondent if the special master concludes that petitioner has proven her *prima facie* case" (first citing *Doe/11 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 1, 12 (2009), *aff'd*, 601 F.3d 1349 (Fed. Cir. 2010); *see also Pafford*, 451 F.3d at 1357–39; *Shyface*, 165 F.3d 1344).

There is also little in the way of treater evidence embracing vaccine causation. At most, Dr. Bennett opined to an association, but he did so based purely on a single, in-person patient examination that occurred months after Petitioner's December 2019 treatment (since he did not encounter her before the summer of 2020), with a telehealth follow-up visit. Although it has been established that Dr. Bennett is a highly credentialed and capable neurologist, it remains reasonable to give his views less weight than more contemporaneous treater comments on vaccine causation (and here, there is little to no commentary by treaters in the first six months of treatment that the flu vaccine might have caused Petitioner's injury).

Dr. Bennett's causation opinion was, furthermore, somewhat conclusory in nature. He relies on evidence that the flu vaccine could cause TM (a proposition that I am not for present purposes disputing) almost wholly to explain why it likely did so to the Petitioner—essentially combining the first two *Althen* prongs into one, resulting in an analysis that only requires evidence of onset of TM post-vaccination, and a lack of other explanations, to deem the second prong met. And Dr. Bennett otherwise seems to have placed great weight on the exclusion of other possible

causes. Bennett Rep. at 1, 2. But he also concurred with the reasonableness of maintaining infarct in Petitioner's differential. Ex. 7 at 2 (stating "[o]ther diagnoses to consider include spinal cord infarction vs. spinal cord dural fistula vs. alternative inflammatory etiology such as sarcoidosis").

At bottom, this claim involves a record with little in it suggesting that in the time between vaccination and onset, Petitioner was likely undergoing an antibody-mediated process leading to spinal cord neuroinflammation. She had no initial reaction to the vaccination. Her first CSF testing results revealed little evidence of neuroinflammation. Her initial imaging was not deemed by treaters to yield abnormal results—and even if that determination is now considered to have been in error, later imaging better supported infarct. And the sudden onset of progressively-declining symptoms is also a bad fit, factually, for a vaccine-induced disease process that was already underway prior to onset of symptoms (for a vaccine administered over five weeks before).

Why did the putative, vaccine-initiated process of antibody production not result in more obvious MRI findings supporting neuroinflammation, at the time Petitioner was experiencing particularly severe symptoms? Why did Petitioner not experience some neurologic symptoms as precursors to her sudden declining progression on December 8, 2019? Petitioner's experts cannot answer these questions, beyond the reflexive, *post hac ergo propter hoc* arguments so common in the Vaccine Program—but rejected as insufficient grounds for entitlement. *Fricano v. United States*, 22 Cl. Ct. 796, 800 (1991) (citing *Loesch v. United States*, 227 Ct. Cl. 34, 45, 645 F.2d 905, 914 (*post hoc ergo propter hoc* approach to causation is unpersuasive), *cert. denied*, 454 U.S. 1099, 102 S. Ct. 672, 70 L.Ed.2d 640 (1981); *Doe/34 v. Sec'y of Health & Hum. Servs.*, 2009 WL 1955140, at *10 (Fed. Cl. Mar. 4, 2009), *aff'd sub nom. Jane Doe*34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758 (2009) (citing *Grant v. Sec'y of Health & Hum. Servs*, 956 F.2d 1144, 1148 (Fed.Cir.1992) ("the inoculation is not the cause of every event that occurs [after].... Without more, this proximate temporal relationship will not support a finding of causation")).

## CONCLUSION

Ms. Henningsen's personal medical experience has been heart-breaking. Her trial testimony established her to be a capable and intelligent individual who (through no fault of her own) suffered a tragic, life-altering medical event that has interfered with many of her personal dreams and aspirations, and at a too-young age. It goes without saying that she has my complete sympathy (and I hesitate to express such an empty sentiment, since it undoubtedly rings hollow given my negative resolution of her claim).

The decision I issue today may not mark the end of this case. Given the complexity of the parties' dispute, the catastrophic nature of the injury, and the complexity of issues to be resolved, Petitioner may well choose to fight on with a series of appeals (as is her right). The extreme nature of her injury alone might be enough to sway a subsequent reviewing judicial panel, in an all-too-

human desire to help a clearly-deserving claimant, engineering an outcome from the record that allows this to occur.

In the end, however, my duty as a special master is to evaluate the evidence before me in as neutral a fashion as possible, reaching the result that a proper weighing of that evidence requires, even when it disappoints an otherwise-deserving individual like Ms. Henningsen. That evidence here does not preponderate in favor of the proposed injury. Although this case has presented a very difficult-to-resolve question, I do not find it to be *close* in the end. I reluctantly conclude Petitioner is not entitled to damages from her receipt of a flu vaccine a month prior to the sudden onset of her life-changing medical issues.

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master